# BRIGGS *v.* SPAULDING.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF NEW YORK.

No. 185. Argued March 3, 4, 1891. — Decided May 25, 1891.

The degree of care required of directors of corporations depends upon the subject to which it is to be applied, and each case is to be determined in view of all the circumstances.

Directors of a corporation are not insurers of the fidelity of the agents whom they appoint, who become by such appointment agents of the corporation; nor can they be held responsible for losses resulting from the wrongful acts or omissions of other directors or agents, unless the loss is a consequence of their own neglect of duty.

A director of a national bank is not precluded from resignation within the year by the provision in Rev. Stat. § 5145 that when elected he shall hold office for one year, and until his successor is elected.

Persons who are elected into a board of directors of a national bank, about which there is no reason to suppose anything wrong, but which becomes bankrupt in ninety days after their election, are not to be held personally responsible to the bank because they did not compel an investigation, or personally conduct an examination.

Directors of a national bank must exercise ordinary care and prudence in the administration of the affairs of a bank, and this includes something more than officiating as figure-heads: they are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrong-doing, if that ignorance is the result of gross inattention.

If a director of a national bank is seriously ill, it is within the power of the other directors to give him leave of absence for a term of one year, instead of requiring him to resign, and if frauds are committed during his absence and without his knowledge, whereby the bank suffers loss, he is not responsible for them.

Applying these principles to this case, *Held*, (1) That the defendant Cushing, having in good faith sold his bank stock and taken proper steps for its transfer, and orally tendered his resignation as a director to the president of the bank, and ceased to act as such, cannot be held liable for the consequences of breaches of trust alleged to have been subsequently thereafterwards committed: (2) That Charles T. Coit was guilty of no want of ordinary care in acting upon the leave of absence given him; and, having died while absent on that leave, his estate is not liable for losses alleged to have been incurred during such absence, and with which he had no affirmative connection: (3) That the defendant Francis T. Coit, having accepted the office of director, when in infirm health, there being at the time others of the board of directors capable of attending to the concerns of the bank, and by reason of physical infirmity having failed to give the attention to the bank's affairs he otherwise would, his estate is held not liable for passive negligence on his part under all the circumstances disclosed in evidence: (4) That as no negligence is shown whereby the alleged losses can be said to have been affirmatively caused by the defendants Johnson and Spaulding, or either of them, they are not to be held responsible simply because during the short period they were directors, they did not discover such losses and prevent them.

THE case was stated by the court as follows :

Smith (subsequently succeeded by Hadley, Hadley by Movius, and Movius by Briggs) exhibited his bill, as receiver of the First National Bank of Buffalo, in the Circuit Court of the United States for the Northern District of New York, on the 4th of May, 1883, against Reuben Porter Lee, Francis E. Coit, Elbridge G. Spaulding, William H. Johnson and Thomas W. Cushing, as directors of that bank, and Anne Vought as executrix of John H. Vought, and Frank S. Coit and Joseph C. Barnes, as administrators of Charles C. Coit, former directors. Francis E. Coit died pending the suit, and Caroline E. Coit, executrix, was made a party defendant.

The bill alleged the organization of the bank as a national banking association under the acts of Congress in that behalf; that it carried on the business of banking from February 5, 1864, to April 13, 1882; that on the 14th of April, 1882, being then insolvent, it suspended business under and by direction of a bank examiner; and that on the 22d of April complainant was appointed receiver by the comptroller of the currency, qualified April 26, and took possession of the bank's books, records and assets of every description.

That on December 7, 1863, at a preliminary meeting of the subscribers to the stock of the bank, certain articles of association were duly adopted and executed, a copy of which was annexed; that these articles remained unchanged, except that the number of directors was reduced from nine to five; that by-laws were adopted by the board of directors December 13, 1863, a copy of which was annexed, and continued unaltered from thence forward; and that on January 7, 1879, at a meeting of the directors, a resolution was adopted requiring the directors to meet regularly at the bank once in each month to look after the affairs of the bank and transact such business as might come before them. It was further alleged that defendant Lee was a director from January 12, 1877, to April 14, 1882; that defendants Spaulding and Johnson were directors from January 10 until April 14, 1882, "except as the defendant Spaulding was disqualified by the sale of his stock on April 11, 1882;" that defendant Francis E. Coit was a director from May 20, 1881, and so remained, except as disqualified

by the sale of his stock April 11, 1882; that defendant Cushing was a director from June 7, 1879, to January 10, 1882, on which day his successor was elected; that John H. Vought was a director from January, 1865, and remained such, except as he was disqualified by the sale of his stock January 18, 1882; and that Charles T. Coit was elected a director January 11, 1870, and continued to act as such until about December 11, 1881, when he died intestate, and letters of administration were issued to Frank S. Coit and Joseph C. Barnes as administrators. It was further averred that from June 7, 1879, to December 11, 1881, Charles T. Coit was president of the bank and defendant Lee its cashier; that down to about October 3, 1881, Charles T. Coit continued in the active discharge of his duties as president, and on that day was given a leave of absence for one year from those duties, and the defendant Lee was made vice-president and placed in charge of the bank; that Lee also continued to be cashier and one McKnight was assistant cashier thereof; and that on January 10, 1882, a new board of directors was elected consisting of the defendants Spaulding, Johnson, Francis E. Coit, Lee and Vought, who elected officers for the ensuing year, Lee as president, Francis E. Coit as vice-president, McKnight as cashier and one Bogert as assistant cashier. The bill then charged that down to about October 3, 1881, being the date when the defendant Lee was made vice-president and placed in charge of the bank, "the said bank was solvent and engaged in a prosperous business; that the capital stock of said bank was one hundred thousand dollars, which was entirely paid up, and was divided into shares of the par value of one hundred dollars each, and that said shares were then saleable at not less than one hundred and fifty dollars each, and were actually worth about that sum; that from the time of its organization down to said last-mentioned date the said bank had declared and paid dividends on its said capital stock, amounting in the aggregate to upwards of 285 per cent thereon; that said bank then had a surplus or reserve fund representing undivided profits of said bank amounting nominally to seventy-four thousand two hundred and seventy-seven dollars and

three cents ($74,277.03), and had actually a large surplus;" that on April 14, 1882, the bank was largely insolvent; that its surplus and capital stock had been exhausted; that its total liabilities to its creditors, not including the amount of its capital stock, or other liability to its stockholders as such, amounted to $1,160,763.77; that its assets were nominally not less than $1,351,199.69, not including the liability of the stockholders on their stock; that a large portion of such assets were utterly worthless, and that the deficiency then existing in the good assets as compared with its liabilities was not less than $535,163.42, or about 46 per cent of the liabilities; that statements of the nominal financial condition of the bank, as shown by its own books, as of the dates October 3, 1881, January 9, 1882, and April 14, 1882, are annexed; but those of January 9 and April 14 fail to show that "any of the bills discounted or cash items, as therein stated, were worthless or uncollectible, or that the said bank had suffered any considerable loss by reason of bad debts or wasteful management, contrary to the facts as hereinbefore and hereinafter stated." The bill further averred that the greater part of the losses of the bank during the period between October 3, 1881, and April 14, 1882, and the consequent failure of the bank, were due to the misconduct of the officers and directors of the bank, and to the failure of the directors to perform faithfully and diligently the duties of their office, and it was particularly alleged that it was the duty of the directors, "by reason of the nature of their office and of the principles of the common law applicable thereto, and under and by virtue of the provisions of the Revised Statutes of the United States, and of the acts of Congress relating to national banks, and of the articles of association and by-laws of the said bank, hereinbefore referred to, diligently, carefully and honestly to administer the affairs of the said bank; to employ none but honest and competent persons to serve as officers of the said bank; to take from all persons so employed sufficient security for the faithful performance of their duties; to keep correct books of account of all the affairs, business and transactions of the said bank; to see that the business of the said bank was prudently con-

ducted, and that the property and effects of the said bank were not wasted, stolen or squandered;" etc., etc.

It was then charged that the directors utterly failed to perform each and every of their official duties, and during all the period from October 3, 1881, to April 14, 1882, paid no attention to the affairs of the bank; failed to hold or call meetings; or to appoint any committee of examination; or to require bonds; or to make personal examinations into the conduct and management of its affairs and into the condition of its accounts, but allowed the executive officers to manage it without supervision.

The bill further charged that the defendants permitted the reserve of the bank to remain below the amount required by Rev. Stat. § 5191, and that a large part of the losses of the bank arose from the unlawful extension of its line of discounts, and would have been prevented if the directors had performed their duty and prevented the increase; that on or about November 7, 1881, the surplus and undivided profits had been exhausted and the capital stock impaired, and this should have been reported to the Comptroller, whereby the capital would have been made good, or the said bank would have necessarily been put into liquidation and further losses thereafter incurred by continuance of its business would have been stopped.

It was also asserted that, independently of the provisions of the acts of Congress, the directors were trustees for the bank, and its stockholders and creditors, and it was their duty to have ascertained whether the bank had sustained losses and made known the facts and the general condition of the bank and the methods of its management, which duties they neglected and failed to perform, and by reason thereof the bank sustained great losses, amounting in the aggregate to at least $685,163.42.

It was further alleged that it was unlawful for the bank to allow any one person, company, corporation or firm to become indebted to an amount exceeding one-tenth of the capital stock, excepting by a discount of bills of exchange drawn in good faith and of business or commercial paper actually owned by the person negotiating it; but that the directors

from October 3, 1881, to April 14, 1882, permitted this to be done, and thereby a loss of at least $556,215.62 was occasioned; that it was the duty of the directors and officers of the bank to make accurate reports to the comptroller, and they did October 1, 1881, submit a report, and on December 31, 1881, and March 11, 1882, further reports, but the reports dated December 31, 1881, and March 11, 1882, were false and misleading, and particularly in representing that the bank had a surplus fund and undivided profits amounting to large sums, and an unimpaired capital, and failing in any way to show that the bank had sustained heavy losses; whereas the bank had not at either of the dates any surplus or undivided profits, and its capital stock was exhausted or largely impaired on December 31, 1881, and on March 11, 1882, entirely exhausted, by reason of improvident and careless management, etc.; that by reason of the false and misleading character of the reports the comptroller and stockholders and creditors of the bank were not informed of its actual condition, and failed to take steps to repair the losses or put the bank in liquidation, by reason of which the bank incurred further losses. And further, that it was the duty of the directors who were such from October 3, 1881, to April 14, 1882, to appoint only honest, faithful, trustworthy, experienced and competent persons as officers of the bank, and to require bond or other security, and remove them if they were incompetent or untrustworthy in the performance of their duties; that during all that period of time the directors then in office elected and appointed to the positions of president, vice-president, and cashier, persons who were unfit, untrustworthy, incompetent and unfaithful, and more particularly in the appointment of Lee as vice-president and president, McKnight and Bogert being mere clerks of the bank and subject absolutely to the control and direction of Lee; that Francis E. Coit never actually assumed or performed any of the duties properly appertaining to the office of vice-president, and was of no value to the bank as one of its executive officers; that by reason of the foregoing Lee was during all the period from October 3, 1881, down to the stoppage of the bank, in absolute control thereof, without any

check, oversight or supervision whatever, which fact was at all times known to the directors of the bank; that Lee was a person of inconsiderable financial responsibility and of insufficient age and experience to qualify him for the position, and it was an act of gross negligence on the part of the directors to trust the entire management of the bank, or even the proper performance of the duties of president, to Lee; that under Lee's management the line of discounts was increased by lending large sums of money on accommodation paper to Lee personally and to members of his family and his personal friends, and to other persons with whom the said Lee was engaged in speculations, all of whom were of little or no financial responsibility, many of the loans being in excess of the amount allowed by the acts of Congress; that Lee failed to take sufficient security for the loans, and in many cases none at all; that Lee himself borrowed large sums of money upon his own notes and by overdrawing his account, and an examination of the books would have disclosed the fact, and that Lee was lending the funds of the bank to individuals of insufficient responsibility, and otherwise improperly managing the affairs of the bank and demonstrating his unfitness for the position; and transactions with one Hall were set forth at length, and other improvident transactions; and it was charged that by reason of Lee's reckless, improvident and criminal conduct, the bank "which had been solvent and in a fair financial condition on the said 3d day of October, 1881, became insolvent and was compelled to go into liquidation on the 14th day of April, 1882, as hereinbefore alleged;" that all of his acts in effecting the loans appeared on the books and might have been discovered by the directors by a proper examination, and it was owing to their negligence and inattention to duty that Lee was permitted to continue in office and to continue his mismanagement of the bank's affairs until it had become insolvent; therefore, the complainant insisted that the directors were responsible for all losses sustained by the bank through the negligence and wrongful conduct of Lee.

It was further alleged that on January 18, 1882, Vought sold his stock in the bank, and that Spaulding and Francis E.

Coit sold their stock on April 11, 1882, and that thereby each of them became disqualified to act as a director, but none of them resigned; that on April 14, 1882, the stock was held as follows: Lee, 170 shares; Hall, 578 shares, purchased April 11, 1882; Prosser, 50 shares; Barnum, 30 shares; Marshall, 10 shares; Mr. Rochester, 10 shares, and Mrs. Rochester, 12 shares, all purchased in January, 1882; Gluck, 20 shares, purchased in December, 1881, and 10 purchased in January, 1882; Mrs. Stagg, 100 shares, held since 1864; and defendant Johnson, 10 shares, purchased January 9, 1882; that all the stockholders, except Lee, Hall and Johnson, were ignorant of the bank's condition and innocent of all participation in the negligent and wasteful management of the bank, and have been subjected by reason of the negligence, inattention to duty and wrongful acts of the directors to a loss equal to double the amount of the par value of their shares of stock together with the amount of their proportionate interest in the surplus and undivided profits, which their respective interests in the stock of the bank would have brought them if the bank "had continued in the condition in which it was on the said 3d day of October, 1881."

And complainant claimed to be entitled to sue for and recover all the losses and damages which the bank, its stockholders and creditors had sustained in the premises.

The bill prayed for answers, the oath not being waived, and for general relief; and was taken as confessed against the defendants R. P. Lee and Anne M. Vought, as executrix of John H. Vought.

Spaulding, Johnson, Cushing, the executrix of Francis E. Coit and the administrators of Charles T. Coit answered severally.

These answers denied the jurisdiction of the court; and denied that the receiver could maintain the action as one for equitable relief, and insisted that the remedy, if any, was at law.

The answers of the executrix and the administrators denied that the cause of action survived. Cushing claimed that his responsibility, if any, terminated upon the sale of his stock September 24, 1881.

The defence was set up on behalf of Charles T. Coit that he could not be held responsible from October 3 to December 11, 1881, when he died, because of his ill health and absence on the leave granted to him on October 3 ; and it was insisted on behalf of Francis E. Coit that he should be excused for failure to attend to the business of the bank by reason of his ill health, so far as he did not attend to it, if responsible at all.

The same defence was made on behalf of Johnson, with the added fact of serious illness in his family ; and the age and practical retirement from business of Mr. Spaulding were also set forth.

All denied any intentional wrong-doing, or omission of duty, or legal responsibility for the losses. All asserted their confidence in Lee's capacity and integrity and their belief in the sound financial condition of the bank. All denied any neglect of duty in the premises, and it was denied that any special losses occurred from January 10, 1882, to the stoppage of the bank; and asserted on behalf of Spaulding and Francis E. Coit that if any loss happened between the 11th of April and the 14th they could not be held responsible under the bill as framed, as they had parted with their stock and thereby ceased to be directors.

Voluminous evidence was taken and upon the hearing of the cause the bill was dismissed as to defendants Spaulding, Johnson and Caroline E. Coit, executrix, without costs, and as to defendants Cushing and the administrators of Charles T. Coit, with costs.

. From this decree an appeal was prosecuted to this court. The opinion of the Circuit Court will be found in *Movius* v. *Lee*, 30 Fed. Rep. 298.

The Circuit Court held that defendant Cushing ceased to be a director of the bank prior to the occurrence of the losses as alleged and owed no duty in that behalf, and that Charles T. Coit's absence on leave from October 3, 1881, to his death, December 11, 1881, exonerated him, and that defendants Spaulding, Johnson and Francis E. Coit were not liable under the statute, because they did not come within its provisions, nor by the common law, for by that each was liable only for his own miscarriages and none were shown.

*Mr. Ansley Wilcox* and *Mr. W. Hallett Phillips* for appellant.
*Mr. John G. Milburn* was on their brief.

*Mr. E. C. Sprague* for appellee Spaulding.

*Mr. Benjamin H. Williams* for appellee Johnson.

*Mr. David F. Day* for appellee Cushing.

*Mr. Daniel N. Lockwood* for appellee Coit's administrator.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

In the language of appellant's counsel, the bill was framed upon the theory of a breach by the defendants as directors "of their common law duties as trustees of a financial corporation and of breaches of special restrictions and obligations of the national banking act."

And it is claimed that the defendants should have been held liable for the losses which occurred through loans of the bank's funds and moneys during their term of office as directors, to Lee, his father, his wife and certain designated persons, which were the principal losses, though there were others smaller in amount for which they were responsible.

This liability is alleged to have been incurred by Lee for all loans from October 3, 1881, until April 14, 1882; by F. E. Coit for all losses through the mismanagement of the bank from October 3, 1881, until April 14, 1882, which could have been prevented by reasonable diligence and care on the part of the directors; by John H. Vought on the same basis and for the same time; by Charles T. Coit from October 3 to December 11, 1881; by Cushing from October 3, 1881, to January 10, 1882, unless his liability terminated with the transfer of his stock on the books of the bank; by Spaulding and Johnson from January 10 to April 14, 1882.

It is contended, as an independent proposition, that each of the defendants should have been held liable for all loans made during the periods before mentioned when the loans exceeded ten per cent of the capital of the bank, in violation of Rev.

Stat. § 5200, and also for all loans made while the bank's reserve was below fifteen per cent of its deposits, in violation of Rev. Stat. § 5191, where such loans resulted in losses.

And finally, that each of the defendants should have been held absolutely liable for all losses of the bank incurred by carrying on its business after its capital became impaired or exhausted and the bank insolvent.

Under Rev. Stat. § 5136, national banking associations were empowered " Fifth. To elect or appoint directors, and by its board of directors, to appoint a president, vice-president, cashier and other officers, define their duties, require bonds of them and fix the penalty thereof, dismiss such officers or any of them at pleasure, and appoint others to fill their places. Sixth. To prescribe, by its board of directors, by-laws not inconsistent with law, regulating the manner in which its stock shall be transferred, its directors elected or appointed, its officers appointed, its property transferred, its general business conducted and the privileges granted to it by law exercised and enjoyed. Seventh. To exercise by its board of directors, or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking ; by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt ; by receiving deposits ; by buying and selling exchange, coin and bullion ; by loaning money on personal security ; and by obtaining, issuing and circulating notes according to the provisions of this title."

By section 5145, the affairs of each association were to be managed by not less than five directors, to be elected at meetings to be held in January, and to hold office for one year and until their successors were elected and had qualified ; and by section 5146, every director was obliged to own in his own right at least ten shares of the capital stock, and if he ceased to own the required number of shares or became in any other manner disqualified, he thereby vacated his place. By section 5148, any vacancy in the board was to be filled by an appointment by the remaining directors, and any director so appointed held his place until the next election.

·Section 5147 provided that: "Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of this title, and that he is the owner in good faith, and in his own right, of the number of shares of stock required by this title," etc.

By section 5211, every bank was required to make not less than five reports during each year, under the oath of the president or cashier, and attested by at least three of the directors, exhibiting in detail the resources and liabilities of the bank, and the comptroller could call for special reports.

Under section 5240, the appointment of bank examiners was provided for, with power to make thorough examination into the affairs of any bank, and in doing so to examine any of the officers and agents on oath, and make a full and detailed report to the comptroller.

Section 5239 is in these words: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents or servants of the association to violate any of the provisions of this title, all the rights, privileges and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district or territorial court of the United States, in a suit brought for that purpose by the comptroller of the currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders or any other person, shall have sustained in consequence of such violation."

When the banking act was originally passed and this bank was organized that which is now subdivision seven of section 5136 did not contain the words "or duly authorized officers or agents, subject to law;" that is, the original act provided that the board of directors might exercise all such incidental powers as should be necessary to carry on the business of banking, as

there specified, but said nothing about the exercise of those powers by the bank officers or agents. The words were inserted in the Revised Statutes, 1873, 1874.

The articles of association of the First National Bank of Buffalo were framed under Rev. Stat. § 5133, and provided for an annual meeting of the stockholders; that the board of directors should appoint a president, cashier and such other officers and clerks as might be required to transact the business of the association and define their respective duties, and by their by-laws specify by what officers of the association or committee of the board the regular banking business of the association should be conducted; and empowered the board of directors to require bonds of the officers. The by-laws of the institution were adopted December 13, 1863, and had relation to the then powers of the board of directors. By section 13 a standing committee was provided for, to be known as the exchange committee, consisting of the president and three directors, appointed by the board every six months, which had power to discount bills, notes, etc., and was required to report at the regular board meetings. Under section 19 a committee was to be appointed every three months to examine into the affairs of the bank and report to the board. Regular meetings were required to be held monthly. It is alleged that on the 7th of January, 1879, the board requested itself to meet thereafter regularly on the first of every month, "to look after the affairs of the bank," etc.

It appears that the provisions of the by-laws were not observed, at least after the amendment in sub-section 7, § 5136, and that the management of the bank was left almost entirely to the officers. No exchange committee nor examination committee was appointed, and the meetings of the board were infrequent and perfunctory. For years prior to the failure, fourteen at least, the business of the bank had been conducted by the president.

It is not contended that the defendants knowingly violated, or permitted the violation of, any of the provisions of the banking act, or that they were guilty of any dishonesty in administering the affairs of the bank, but it is charged that

they did not diligently perform duties devolved upon them by the act.

Our attention has not been called, however, to any duty specifically imposed upon the directors as individuals by the terms of the act, although if any director participated in or assented to any violation of the law by the board he would be individually liable. The corporation after the amendment of 1874 had power to carry on its business through its officers. And although no formal resolution authorized the president to transact the business, yet in view of the practice of fourteen years or more, we think it must be held that he was duly authorized to do so. It does not follow that the executive officers should have been left to control the business of the bank absolutely and without supervision, or that the statute furnishes a justification for the pursuit of that course. Its language does enable individual directors to say that they were guilty of no violation of a duty directly devolved upon them. Whether they were responsible for any neglect of the board as such, or in failing to obtain proper action on its part, is another question. Indeed, it is frankly stated by counsel that "although special provisions of the statute are quoted and relied upon, these do not create the cause of action, but merely furnish the standard of duty and the evidence of wrong-doing;" and section 556 of Morawetz on Corporations is cited, which is to the effect that "the liability of directors for damages caused by acts expressly prohibited by the company's charter or act of incorporation is not created by force of the statutory prohibition. The performance of acts which are illegal or prohibited by law may subject the corporation to a forfeiture of its franchises, and the directors to criminal liability; but this would not render them civilly liable for damages. The liability of directors to the corporation for damages caused by unauthorized acts rests upon the common law rule which renders every agent liable who violates his authority to the damage of his principal. A statutory prohibition is material under these circumstances merely as indicating an express restriction placed upon the powers delegated to the directors when the corporation was formed."

It is perhaps unnecessary to attempt to define with precision the degree of care and prudence which directors must exercise in the performance of their duties. The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances. They are not insurers of the fidelity of the agents whom they have appointed, who are not their agents but the agents of the corporation; and they cannot be held responsible for losses resulting from the wrongful acts or omissions of other directors or agents, unless the loss is a consequence of their own neglect of duty, either for failure to supervise the business with attention or in neglecting to use proper care in the appointment of agents. Morawetz, §§ 551 et seq., and cases.

Bank directors are often styled trustees, but not in any technical sense. The relation between the corporation and them is rather that of principal and agent, certainly so far as creditors are concerned, between whom and the corporation the relation is that of contract and not of trust. But, undoubtedly, under circumstances, they may be treated as occupying the position of trustees to cestui que trust.

In *Percy* v. *Millaudon*, 8 Martin, (N. S.) 68, 74, 75, which has been cited as a leading case for more than sixty years, the Supreme Court of Louisiana, through Judge Porter, declared that the correct mode of ascertaining whether an agent is in fault " is by inquiring whether he neglected the exercise of that diligence and care, which was necessary to a successful discharge of the duty imposed on him. That diligence and care must again depend on the nature of the undertaking. There are many things which, in their management, require the utmost diligence, and most scrupulous attention, and where the agent who undertakes their direction, renders himself responsible for the slightest neglect. There are others, where the duties imposed are presumed to call for nothing more than ordinary care and attention, and where the exercise of that degree of care suffices. The directors of banks, from the nature of their undertaking, fall within the class last mentioned, while in the discharge of their ordinary duties. It

is not contemplated by any of the charters, which have come under our observation, and it was not by that of the Planter's. Bank, that they should devote their whole time and attention to the institution to which they are appointed, and guard it from injury by constant superintendence. Other officers on whom compensation is bestowed for the employment of their time in the affairs of the bank, have the immediate management. In relation to these officers, the duties of directors are those of control, and the neglect which would render them responsible for not exercising that control properly, must depend on circumstances, and in a great measure be tested by the facts of the case. If nothing has come to their knowledge, to awaken suspicion of the fidelity of the president and cashier, ordinary attention to the affairs of the institution is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible."

*Spering's Appeal*, 71 Penn. St. 11, 20, was the case of a bill filed by Spering, as assignee of a trust company, against its directors and others, to compel them to make good losses sustained by the depositors on the ground of fraudulent mismanagement of the affairs of the company. And Judge Sharswood, speaking for the court, said : " It is by no means a well-settled point what is the precise relation which directors sustain to stockholders. They are, undoubtedly, said in many authorities to be trustees, but that, as I apprehend, is only in a general sense, as we term an agent or any other bailee entrusted with the care and management of the property of another. It is certain that they are not technical trustees. They can only be regarded as mandataries — persons who have gratuitously undertaken to perform certain duties, and who are therefore bound to apply ordinary skill and diligence, but no more. . . . We are dealing now with their responsibility to stockholders, not to outside parties — creditors and depositors. It is unnecessary to consider what the rule may be as to them. Upon a close examination of all the reported cases, although there are many *dicta* not easily reconcilable, yet I have found

no judgment or decree which has held directors to account, except when they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, or where such fraud might have been prevented had they given ordinary attention to their duties. I do not mean to say by any means, that their responsibility is limited to these cases, and that there might not exist such a case of negligence or of acts clearly *ultra vires*, as would make perfectly honest directors personally liable. But it is evident that gentlemen selected by the stockholders from their own body ought not to be judged by the same strict standard as the agent or trustee of a private estate. Were such a rule applied, no gentlemen of character and responsibility would be found willing to accept such places." And see *Citizens' Building Association* v. *Coriell,* 34 N. J. Eq. 383 ; *Hodges* v. *New England Screw Company,* 1 R. I. 312; *Wakeman* v. *Dalley,* 51 N. Y. 27.

It was in this aspect that Lord Hatherley remarked in *Land Credit Company* v. *Fermoy,* L. R. 5 Ch. 763, 772 : " Whatever may be the case with a trustee, a director cannot be held liable for being defrauded; to do so would make his position intolerable." And the same view is expressed by Sir George Jessel, M. R., in his opinion in *In re Forest of Dean Coal Mining Co.,* 10 Ch. D. 450, 451, where he says: " One must be very careful in administering the law of joint-stock companies not to press so hard on honest directors as to make them liable for these constructive defaults, the only effect of which would be to deter all men of any property, and perhaps all men who have any character to lose, from becoming directors of companies at all. On the one hand, I think the court should do its utmost to bring fraudulent directors to account, and, on the other hand, should also do its best to allow honest men to act reasonably as directors. Wilful default no doubt includes the case of a trustee neglecting to sue, though he might by suing earlier have recovered a trust fund — in that case he is made liable for want of due diligence in his trust. But I think directors are not liable on the same principle."

The theory of this bill is that the defendants are liable, not

to stockholder nor to creditors, as such, but to the bank, for losses alleged to have occurred during their period of office, because of their inattention.

If particular stockholders or creditors have a cause of action against the defendants individually, it is not sought to be proceeded on here, and the disposition of the questions arising thereon would depend upon different considerations.

In *Preston* v. *Prather*, 137 U. S. 604, 608, it was ruled that gratuitous bailees of another's property are not responsible for its loss unless guilty of gross negligence in its keeping; and whether that negligence existed or not is a question of fact for a jury to determine, or to be determined by the court where a jury is waived. And, further, that the reasonable care which the bailee of another's property entrusted to him for safe-keeping without reward must take, varies with the nature, value and situation of the property, and the bearing of surrounding circumstances on its security. That was a case of persons, engaged in the business of banking, receiving for safe-keeping a parcel containing bonds, which was put in their vaults. They were notified that their assistant cashier, who had free access to the vaults where the bonds were deposited, and who was a person of scant means, was engaged in speculations in stocks. They made no examination of the securities deposited with them, and did not remove the cashier. He stole the bonds so deposited; and it was held that the bankers were guilty of gross negligence, and were liable to the owner of the bonds for their value at the time they were stolen. And Mr. Justice Field, delivering the opinion said: " Undoubtedly if the bonds were received for safe-keeping, without compensation to them in any form, but exclusively for the benefit of the plaintiffs, the only obligation resting upon them was to exercise over the bonds such reasonable care as men of common prudence would usually bestow for the protection of their own property of a similar character. No one taking upon himself a duty for another without consideration is bound, either in law or morals, to do more than a man of that character would do generally for himself under like conditions."

No one of the defendants is charged with the misappropriation

or misapplication of, or interference with, any property of the bank, nor with carelessness in respect to any particular prop-. erty : but with the omission of duty, which, if performed, would have prevented certain specified losses, in respect of which complainant seeks to charge them.

The doctrine that one trustee is not liable for the acts or defaults of his cotrustees, and while, if he remains merely passive and does not obstruct the collection by a cotrustee of moneys, is not liable for waste, is conceded, but it is argued that if he himself receives the funds, and either delivers them over to his associate, or does any act by which they come into the possession of the latter or under his control, and but for which he would not have received them, such trustee is liable for any loss resulting from the waste; *Bruen* v. *Gillet,* 115 N. Y. 10 ; Pomeroy Eq. Jur. §§ 1069, 1081 ; and that this case comes within the rule as thus qualified.

[ Treated as a cause of action in favor of the corporation, a liability of this kind should not lightly be imposed in the absence of any element of positive misfeasance, and solely upon the ground of passive negligence; and it must be made to appear that the losses for which defendants are required to respond were the natural and necessary consequence of omission on their part.

And in this connection the remarks of Mr. Justice Bradley in *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 382, may well be quoted : " We have already adverted to the tendency of judicial opinion adverse to the distinction between gross and ordinary negligence. Strictly speaking, these expressions are indicative rather of the degree of care and diligence which is due from a party and which he fails to perform, than of the amount of inattention, carelessness or stupidity which he exhibits. If very little care is due from him, and he fails to bestow that little, it is called gross negligence. If very great care is due, and he fails to come up to the mark required, it is called slight negligence. And if ordinary care is due, such as a prudent man would exercise in his own affairs, failure to bestow that amount of care is called ordinary negligence. In each case the negligence, whatever epithet we give it, is fail-

ure to bestow the care and skill which the situation demands; and hence it is more strictly accurate, perhaps, to call it simply 'negligence.' And this seems to be the tendency of modern authorities. If they mean more than this, and seek to abolish the distinction of degrees of care, skill and diligence required in the performance of various duties and the fulfilment of various contracts, we think they go too far; since the requirement of different degrees of care in different situations is too firmly settled and fixed in the law to be ignored or changed."

In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is, therefore, ultimately a question of fact, to be determined under all the circumstances.

The alleged liability of the defendants is such that the facts must be examined as to each of them.

As to the defendant Cushing, the evidence establishes that on the 24th of September, 1881, he resigned his office as a director of the bank verbally to Charles T. Coit, the then president, and on that day sold to Mr. Coit the ten shares of the capital stock of which he was the owner. The books of the bank show the sale and transfer as of September 24, 1881, but the certificate and power of attorney authorizing the transfer were apparently not delivered until October 7, when the money was paid, being $125 per share. According to the recollection of Lee, the entry in the transfer book was not made until November, when he thinks the stock was sent up to him by Mr. Coit from New York city, but he was informed of Mr. Cushing's resignation of his position as director on October 3, 1881, by Mr. Coit, who was then president of the bank. This was brought out upon cross-examination, after complainant had examined Lee in chief in relation to Cushing's resignation and the vacancy created by the transfer of his stock. Cushing testified that the transfer was made on

September 24, 1881, and we cannot hold that the Circuit Court erred in concluding that that testimony, coupled with the evidence of the record, outweighed the testimony of Lee, which was, indeed, of minor importance if the resignation had taken effect as stated. It is objected that the evidence of Cushing was incompetent, but we do not find that this objection was made when Cushing was examined and cross-examined as a witness. Nor do we think the evidence incompetent as against complainant. Rev. Stat. § 853; N. Y. Code Civ. Proc. § 829; *Monongahela Bank* v. *Jacobus*, 109 U. S. 275; *Snyder* v. *Fiedler*, 139 U. S. 478.

In *Whitney* v. *Butler*, 118 U. S. 655, 662, it was held that where stock had been sold, and the certificate, with power of attorney for transfer duly executed in blank, delivered to the president of the bank, the responsibility of the original stockholder terminated. And Mr. Justice Harlan said for the court: "It was suggested in argument that the defendants should have seen that the transfer was made. But we were not told precisely what ought to have been done to this end that was not done by them and their agents. Had anything occurred that would have justified the defendants in believing, or even in suspecting, that the transfer had not been promptly made on the books of the bank, they would, perhaps, have been wanting in due diligence had they not, by inspection of the bank's stock register, ascertained whether the proper transfer had in fact been made. But there was nothing to justify such a belief or to excite such a suspicion. Their conduct was under all the circumstances, that of careful, prudent, business men, and it would be a harsh interpretation of their acts to hold (in the language in some of the cases, when considering the general question under a different state of facts) that they allowed or permitted the name of Whitney to remain on the stock register as a shareholder. We are of opinion that, within a reasonable construction of the statute, and for all the objects intended to be accomplished by the provision imposing liability upon shareholders for the debts of national banks, the responsibility of the defendants must be held to have ceased upon the surrender of the certificates to the

bank and the delivery to its president of a power of attorney sufficient to effect, and intended to effect, as that officer knew, a transfer of the stock, on the books of the association, to the purchaser." Tested by this rule the conclusion of the Circuit Court on the matter was correct.

The resignation was orally tendered to the president, and manifestly accepted by him, since the sale of the stock was made at the same time, and the president informed the cashier of the fact a few days afterwards. Putting a resignation in writing is the more orderly and proper mode of procedure, but if the fact exists, and is adequately proven, the result is necessarily the same, as applied to this case. We do not understand that because Section 5145 of the Revised Statutes provides that directors shall hold office for one year and until their successors have been elected and have qualified, this prohibits resignations during the year; and while the banking law is silent as to the time when and the method by which the office of director may be resigned, we think that leaves it as at common law, and that this resignation was effective. *Rex* v. *Mayor, &c. of Ripon,* 1 Ld. Raym. 563 ; *Olmsted* v. *Dennis,* 77 N. Y. 378; *Chandler* v. *Hoag,* 2 Hun, 613 ; *S. C.* 63 N. Y. 624 ; *Bruce* v. *Platt,* 80 N. Y. 379 ; *Port Jervis* v. *Bank of Port Jervis,* 96 N. Y. 550.

Having sold his stock September 24 and resigned his position, Mr. Cushing did not thereafter act as a director, and was not present at the meetings of October 3 and December 17, 1881, and January 10, 1882.

The bill alleges that the bank was entirely solvent on October 3, and engaged in a prosperous business with a large surplus, the shares commanding a premium of fifty per cent. Upon this question there was no issue made as between complainant and Cushing, and while, as hereafter stated, we believe the bank to have been hopelessly insolvent at that date, the case must be determined upon the allegations of the bill, and there is nothing in the record to cast the least suspicion upon the good faith of the transaction. There is no charge of breach of trust prior to the resignation and sale, and the decree as to Cushing must be affirmed.

Charles T. Coit had been the first cashier of the bank and was elected a director in 1870. He was its president from June, 1879, to the date of his death on December 11, 1881. On October 3, 1881, a meeting of the board of directors was held, at which Charles T. Coit, Francis E. Coit, Vought and Lee were present. Cushing, who had resigned on the 24th of September, was absent. It appears that at this meeting a resolution was adopted giving Charles T. Coit, the president, a leave of absence, on account of ill health, for one year. No one was elected president prior to January 10, 1882, in his place. There is no doubt of the severity of his illness and the necessity for his absence; but it is contended that the resolution referred to absence as president and not as director, and that no power existed to allow leave of absence to a member of the board, and so that the resolution should be limited to excuse him from attendance at the bank, but not to permit him to leave the city ; and it is said that if he wished to be absolved from responsibility while absent in search of restored health, he should have resigned. If such were the rule, we apprehend that moneyed corporations would find extreme difficulty in obtaining proper persons to act as directors. But it is not the rule. Mr. Coit was guilty of no want of ordinary care in acting upon the leave of absence, and is not to be held because he did not resign. Invalids are permitted to indulge in the hope of recovery, and are not called upon by reason of illness to retire at once from the affairs of this world and confine themselves to preparation for their passage into another. There was here no neglectful abandonment of duty from October 3 to December 11, and the decree in favor of the administrators of Charles T. Coit was properly rendered.

We pass, then, to the inquiry as to the liability of defendants Spaulding and Johnson. In what did their negligence consist, and were losses occasioned by that negligence, and what losses ? Their conduct is to be judged not by the event, but by the circumstances under which they acted.

Johnson had done business with the bank since 1865, and from 1879 had been a customer individually, and also connected with several firms who kept accounts with the bank

and had a line of discounts there. When requested by Lee in December, 1881, to fill one of the vacancies created by the resignation of Cushing and the death of Charles T. Coit, he objected to doing so, on the ground of want of knowledge of the banking business, and the fact that the nature of his own business carried him away considerably from the city, but finally, upon being informed that the bank was in prosperous condition and that much of his time would not be required, accepted. After the 10th of January he was in the bank from time to time, and inquired about its business, and was told by Lee that everything was going on well. At Lee's request he signed the report of March 11, 1882, which had been sworn to by the cashier, and signed by Francis E. Coit before Johnson signed it. He was informed that the report contained a correct exhibit of the condition of the bank as shown by its books; and Lee testified that it did, and that if incorrect the error could not have been detected by an examination of the books and papers of the bank. Very soon after the 10th of January, Mrs. Johnson became perilously ill, and Johnson, through the extra strain put upon him, fell himself into such a physical and mental condition as incapacitated him from properly attending to business.

Spaulding had had a large and various experience and, as a member of Congress, drafted the original national banking act, was president of a leading bank and connected with several financial corporations, and testified that the practice of banks, so far as he knew, all over the country, was to a large extent to carry on the business through their executive officers, especially where these officers held a majority of the stock; that when he purchased his stock he believed this bank was being conducted by its duly-authorized officers, and his judgment was that his duty as a director was discharged if he attended the meetings to which he was summoned, performed such duties as were specifically required of him and gave such advice as was asked from him; that his summers were spent upon his farm in the country; that in 1882 he was seventy-two years of age; that he was in a measure retired from business, so that he gave very little attention to the affairs of his

own bank, but was ready to give any advice or suggestions when called upon for that purpose upon any special matters; that for many years it had been the practice in the corporations in which he was a director to treat him as an advisory director, and not as a director occupied in the daily management of their affairs; and that he accepted the position upon the understanding that he should occupy this relation.

He set forth in his answer, which was made under oath as required by the bill, and which was, therefore, evidence, that it was well known to the stockholders and most other persons dealing with the bank that he had retired from active pursuits, and that it was only expected of him by the stockholders and the depositors of the bank that he should more especially perform such duties as he should be specifically required to perform by its board of directors and officers, and that he should impart such advice in its management as he should be asked to give in the course of its business.

He further stated that he never received or expected to receive any compensation or benefit from the bank as a director; that Lee was the owner of a large majority of the stock; that, as is customary in such cases, Lee had assumed, to a large extent, the management and control of the bank, with the knowledge of the other directors and with the knowledge of the stockholders of the bank, and most, if not all, of the depositors therein; and upon information and belief "that long before he became a stockholder of said bank, and up to the time he became such stockholder, and while he was such stockholder, it was understood by all persons having dealings with the said bank that the said Lee practically administered the affairs thereof, as its chief executive officer."

A large amount of evidence was given tending to show that nearly if not all of the present creditors of the bank were familiar with the fact that the business of the bank was conducted, so far as its discounts and other banking business was concerned, without the intervention of the board of directors, or a committee of that board.

Mr. Spaulding further testified that he never received any notice to attend directors' meetings; that he had no actual

knowledge of the by-laws; that he was not appointed on any committee or requested to perform any duty; that he supposed the bank was in a prosperous condition down to the day of its failure; that he had confidence in Lee's capacity and integrity, and that the business of the bank was being conducted safely and prosperously under his management; that he talked with Lee in regard to the affairs of the bank, who told him the bank was in good condition; that he examined the reports made to the comptroller, December 31, 1881, and March 11, 1882, and saw by them that everything was going right; and that he knew the duty of making an examination had not been devolved upon him; and further stated that it would have taken a month to have ascertained whether the reports to the comptroller were correct; and that it was the duty of the comptroller and the bank examiner to do so.

The evidence fairly establishes that this bank was in good credit up to the time of its failure. It had been in existence for eighteen years; had been prosperous; had paid dividends regularly, down to and into 1881, and its stock had for years stood far above par, at fifty per cent above, October 3, 1881, according to complainant. Neither the defendants, nor the bank's customers, nor the community, appear to have entertained the least suspicion as to its solvency. The losses which it is claimed rendered it insolvent, and for the recovery of which losses this action was instituted, occurred by reason of the discounting by Lee of the paper of persons engaged with him in outside business and speculations, who were not adequately responsible for their engagements. The vice in the situation lay, not in the reports nor in the books, upon their face, but in the unreliability of the bills receivable.

Were these defendants guilty of negligence in allowing Lee to remain in charge of the bank? Would they have been so guilty if they had put him in charge for the first time on the 10th of January?

It appears that Lee went into the employment of this bank in 1868, being then eighteen years old, and so remained until April 14, 1882, occupying in succession the positions of messenger boy, book-keeper, teller, assistant cashier, cashier, vice-

president and president. He was the son of an old and well-known citizen of Buffalo, a graduate of its high school; was or had been one of the trustees and treasurer of a leading church in Buffalo, treasurer of the Young Men's Christian Association, and a member of the Young Men's Association. His general character was good, his reputation for integrity and financial capacity excellent, and he possessed the confidence of his fellow-citizens. Upon the 10th of January, 1882, he was the owner of two-thirds of the stock of the bank, and had apparently a greater interest than any other person in seeing that its affairs were so managed that its capital would remain unimpaired. The business of the bank had been conducted for years by the president, assisted by the other executive officers, and it had seemingly been well conducted. Lee was selected to assume the management when Charles T. Coit retired in October, 1881, by the then board of directors, and there was nothing to indicate that the choice was not a proper and fit one. We think no jury would have been justified in finding defendants guilty of negligence in retaining Lee in the management of the bank. Nor was there any violation of law in permitting him to conduct its business, for he was duly authorized to do so under the provisions of the act. We do not mean that this dispensed with reasonable oversight by the directors, but that belongs to a different branch of inquiry.

But it is contended that defendants should have insisted on meetings of the board of directors or had special meetings called, and at those meetings or otherwise made personal examination into the affairs of the bank, and that had they done this they would have discovered the condition of the bank and prevented losses occurring subsequently to the 10th of January.

Here, again, it should be observed that even trustees are not liable for the wrongful acts of their co-trustees unless they connive at them or are guilty of negligence conducive to their commission, and that Lee and Vought had long been directors.

It is shown that for fourteen years the affairs of the bank

had been left wholly with the president and cashier, and that from the 10th of January to the stoppage of the bank the business was done as it had always been done. No bonds had been required of the officers for at least fourteen years; no meetings were held by the board of directors except the annual meeting and meetings to declare dividends or on some special occasion; no exchange committee had been appointed since 1875; and no committees had ever been appointed to examine into the bank's affairs, question its cashier, or compare its assets and liabilities with the balances on the general ledger. So that this manner of conducting the business had been sanctioned by long-continued usage, and the evidence tends to show that the method pursued must have been and was well known to many of its customers, including those who were creditors at the time of its failure, as well as its stockholders. All this was not as it should have been, and ought not to be countenanced, but the facts have an important bearing on the question whether Spaulding and Johnson should be held liable because they did not at once endeavor to change the entire methods of doing business and enter upon an exhaustive investigation of the assets. Would ordinarily prudent and diligent men have done so under similar circumstances? It is not so much a question of holding meetings, as of examination, searching and thorough; an overhauling of the bills receivable, and the detection of the uncollectible indebtedness which rendered the bank insolvent. Were Spaulding and Johnson guilty of negligence in that they did not make such an examination within ninety days after they became directors, in the teeth of the assurances of Lee, in whom they reposed confidence, who had been connected with the bank for so many years, and who owned two-thirds of the stock?

The kind of examination required is indicated by the fact that although the evidence leaves it beyond question that the bank was insolvent on the third of October, 1881, its capital and surplus wholly exhausted, and losses incurred for thousands of dollars beyond that amount, complainant, after a year's close investigation, alleges that the bank was at that time

solvent, engaged in a prosperous business, with an unimpaired capital and a surplus, and with stock standing at fifty per cent above par. Indeed, the books and papers of the bank were kept in such a condition that even the cashier swore that he did not suspect anything wrong in the management until April 10, 1882.

There were, it is true, two transactions in violation of the provisions of the banking law, not entered on the books, and to which the learned circuit judge refers. On the 18th of January, 1882, Lee took $23,680 from the cash of the bank, which he replaced by a slip of paper with the amount on it in the cash drawer. This was called a cash item, and was thereafter counted as cash. It was reduced from time to time until on April 12 it was $12,405. On February 15, he took $16,737.50 in the same way from the bank's cash and placed a similar slip in the drawer. This was reduced by April 12 to $11,435. These transactions were not concealed from the cashier and subordinate officers of the bank, yet, in view of Lee's position and character, excited no suspicion, and the directors were not informed of the facts.

Again, under section 5200 Rev. Stat., the total liabilities for money borrowed to any national banking association of any person, company, etc., should at no time exceed one-tenth part of the capital stock, but the discount of bills of exchange drawn in good faith against actually existing values, and of commercial or business paper actually owned by the person negotiating the same, is not to be considered as money borrowed. This provision was grossly violated, but while Lee testified in chief for complainant that the directors could have ascertained from an examination of the books, papers and notes whether or not the loans, which exceeded $10,000, were for discounts of bills of exchange or business paper, within the exception, he stated, on cross-examination, that it would not have been possible, from an inspection of the paper simply, or an examination of the books of the bank, or both, to have made the discovery, thus drawing a recognized distinction between bare inspection and thorough examination, a distinction also applicable to loans when the reserve was below

fifteen per cent of the deposits, and generally. We are impressed by the evidence with the conviction that a cursory glance would not have been enough.

Would it not have been the exercise of an extraordinary degree of care if these defendants had insisted, within the first ninety days, upon making such an examination?

Certainly it cannot be laid down as a rule that there is an invariable presumption of rascality as to one's agents in business transactions, and that the degree of watchfulness must be proportioned to that presumption.

"I know of no law," said Vice-Chancellor McCoun, in *Scott* v. *De Peyster*, 1 Edw. Ch. 513, 541, " which requires the president or directors of any moneyed institution to adopt a system of espionage in relation to their secretary or cashier or any subordinate agent, or to set a watch upon all their actions. While engaged in the performance of the general duties of their station, they must be supposed to act honestly until the contrary appears; and the law does not require their employers to entertain jealousies and suspicions without some apparent reason. Should any circumstance transpire to awaken a just suspicion of their want of integrity, and it be suffered to pass unheeded, a different rule would prevail if a loss ensued. But, without some fault on the part of the directors, amounting either to negligence or fraud, they cannot be liable."

Nor is knowledge of what the books and papers would have shown to be imputed. In *Wakeman* v. *Dalley*, 51 N. Y. 27, 32, Judge Earl observed in relation to Dalley, sought to be charged for false representations in the circular of a company of which he was one of the directors: " He was simply a director, and as such attended some of the meetings of the board of directors. As he was a director, must we impute to him, for the purpose of charging him with fraud, a knowledge of all the affairs of the company? If the law requires this, then the position of a director in any large corporation, like a railroad, or banking, or insurance company, is one of constant peril. The affairs of such a company are generally, of necessity, largely intrusted to managing officers. The directors gen-

erally cannot know, and have not the ability or knowledge requisite to learn, by their own efforts, the true condition of the affairs of the company. They select agents in whom they have confidence, and largely trust to them. They publish their statements and reports, relying upon the figures and facts furnished by such agents; and if the directors, when actually cognizant of no fraud, are to be made liable in an action of fraud for any error or misstatement in such statements and reports, then we have a rule by which every director is made liable for any fraud that may be committed upon the company in the abstraction of its assets and diminution of its capital by any of its agents, and he becomes substantially an insurer of their fidelity. It has not been generally understood that such a responsibility rested upon the directors of corporations, and I know of no principle of law or rule of public policy which requires that it should."

And so Sir George Jessel, in *Hallmark's Case,* 9 Ch. D. 329, 332: "It is contended that *Hallmark,* being a director, must be taken to have known the contents of all the books and documents of the company, and so to have known that his name was on the register of shares for fifty shares. But he swears that in fact he did not know that any shares had been allotted to him. Is knowledge to be imputed to him under any rule of law? As a matter of fact, no one can suppose that a director of a company knows everything which is entered in the books, and I see no reason why knowledge should be imputed to him which he does not possess in fact. Why should it be his duty to look into the list of shareholders? I know no case, except *Ex parte Brown,* 19 Beav. 97, which shows that it is the duty of a director to look at the entries in any of the books; and it would be extending the doctrine of constructive notice far beyond that or any other case to impute to this director the knowledge which it is sought to impute to him in this case."

We are of opinion that these defendants should not be subjected to liability upon the ground of want of ordinary care, because they did not compel the board of directors to make such an investigation and did not themselves individu-

ally conduct an examination, during their short period of service; or because they did not happen to go among the clerks and look through the books, or call for and run over the bills receivable.

Of course a thorough examination would have ascertained that the bank ought to be put into liquidation at once. Nothing that could have been done on or after the 10th of January would have saved it. Insolvent on the 3d of October, its condition had changed for the worse January 10. And it is worthy of notice that the persons or firms, losses by reason of advances to whom are named in argument as the main cause of the failure and basis of recovery, were all debtors of the bank October 3, 1881, some of them for a long time before, and all debtors January 10, 1882, and the figures of the experts seem to show that the amounts due from them at the latter date were not many thousand dollars greater in the aggregate on April 14, 1882. The indebtedness of Lee, his father and his wife was nominally less, while that of some of those through whom he appears to have conducted his operations was larger. According to him such increase in poor assets, as there was, was substantially attributable to increased loans made in the hope of carrying through parties already in debt to the bank, and he says that there was really no material change in the character of the paper between January 9 and the stoppage of the bank.

But it is unnecessary to do more than refer to these matters as indicative of the uncertainty as to what losses would have been prevented if the bank had been wound up earlier than it was and as to the point of time to which the supposed liability should be referred, if an interlocutory decree had been entered.

We are not disposed, therefore, to reverse the decree as to defendants Spaulding and Johnson, and although the case of Francis E. Coit was in some aspects different, and particularly in that he was a director for a longer period, we think it should take the same course. He was elected a director May 20, 1881, to fill a vacancy created by the death of George Coit. He was at the time an invalid, and by reason of his

infirmity in health unable to transact business, at least with facility.... His co-directors at the time of his election were Charles T. Coit, Vought, Cushing and Lee. He was re-elected January 10, 1882. The evidence shows that he had for many years been afflicted with rheumatism. So far as appears, Lee, Vought and Cushing were in good health, although Charles T. Coit was not, but the latter continued in the management of the bank down to the third of October. While it may be said that Francis E. Coit should not have accepted the position of director, and should not have allowed himself to be re-elected, yet upon this question of passive negligence the rule would be an exceedingly rigorous one which made no allowance for the person charged under such circumstances. And upon the whole we do not feel called upon to question the decision as to him.

It must be remembered that in cases turning upon questions of fact, in order to reverse, we must be prepared to hold that the findings were not justified. And this we cannot do, taking into consideration all the facts contained in this voluminous record, which we have attempted thoroughly to explore.

The turning point, so far as defendants Spaulding and Johnson are concerned, (and we include with them Francis E. Coit,) is whether under all the circumstances they were guilty of negligence, producing any of the losses in question, not affirmatively, but because they did not prevent them; and this depends upon whether they should have made an examination of the books and assets of the bank, and whether, if they had, that would have enabled them to discover such a condition of affairs as would have resulted in placing the bank in liquidation, and whether thereby some of the losses would have been averted.

Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figure-heads. They are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought

they to be permitted to be shielded from liability because of want of knowledge of wrong-doing, if that ignorance is the result of gross inattention; but in this case we do not think these defendants fairly liable for not preventing loss by putting the bank into liquidation within ninety days after they became directors, and it is really to that the case becomes reduced at last.] For the reasons given, the decree will be

*Affirmed.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE GRAY, MR. JUSTICE BREWER and MR. JUSTICE BROWN, dissenting.

MR. JUSTICE GRAY, MR. JUSTICE BREWER, MR. JUSTICE BROWN and myself are unable to concur in the opinion and judgment of the court.

We accept, as sufficient, the reasons given for the exemption of the estate of Charles T. Coit and of Cushing from liability for the losses of the bank here in question. But we are of opinion that, under the evidence, the defendants Elbridge G. Spaulding, Francis E. Coit, and W. H. Johnson became respectively liable for such of those losses as could have been prevented by proper diligence upon their part as directors. It would serve no useful purpose to refer in detail to all the evidence establishing their dereliction of duty. In our opinion, the proof is clear and convincing that a considerable part of the amount lost to the bank, and therefore to its stockholders and depositors, could have been saved, if they had exercised such care in the supervision and management of the bank's business, as men of ordinary diligence exercise in respect to their own business. In fact, those gentlemen, while they were directors, had no knowledge whatever of what was being done by Lee in the conduct of the bank. They took his word that all was right, and gave no attention whatever to the management of its business. Their eyes were as completely closed to what he did, from day to day, in directing the affairs of the bank, as if they had deliberately determined not to see and not to know how he controlled its

business. In the cases of Francis E. Coit and Johnson, there are some mitigating circumstances arising out of the condition of their health, at particular dates, but they are not such as to relieve them from the responsibility they assumed by becoming directors. When Lee asked Johnson to become a director, the latter expressed doubt as to whether he could give the bank much of his time. But Lee said to him that "he could fix that all right." Johnson having, upon one occasion, inquired, in a general way, how the bank was getting on, Lee replied, "nicely;" and Johnson was satisfied. Both Francis E. Coit and Johnson signed reports to the comptroller of the treasury that were false and fraudulent, without having the slightest knowledge of their truth or falsity. They signed and certified to their correctness entirely upon their faith in Lee. They acted as if confidence in him discharged them from all responsibility touching the management of the bank.

In the case of Mr. Spaulding, there are absolutely no circumstances of a mitigating character. He was learned in the law, and had large experience in banking. He accepted the position of director to accommodate Lee, and without any examination of the condition of the bank. Lee told him the bank was all right, and upon that, and that alone, he rested with implicit confidence. Having taken the oath required by the statute, that he would, so far as the duty devolved upon him, diligently and honestly administer the affairs of the association, and having ascertained that the executive officers were in charge of the bank, performing the duties belonging to their respective positions, he did not, he says, "go any further." Under such circumstances, and as he interpreted the national banking act, he felt himself "relieved from any specified duty." He "had no knowledge of either the provisions of the by-laws or articles of association." In his opinion, if the directors imposed upon the executive officers of the bank the duty of conducting its business, the duties of directors became thereafter "nominal." He performed no duty, while he was director, except "to examine the reports;" but he made no examination to ascertain their correctness. He says: "I regarded my duty as ended, to a great extent, when I saw

the bank was in the same charge that it had been." Being asked whether he went to the bank and made an examination of its books, papers or affairs, he replied: "I did not; I took Mr. Lee's word for it." When asked in reference to the enormous overdrafts, made while he was director, and whether he did anything to prevent them, he replied: "I didn't go to the bank to ascertain. I left the officers in charge as I found them." In response to the question whether from the 10th day of January down to the failure of the bank he had anything to do with the affairs of the bank, aside from holding ten shares of its stock, he said: "I never examined its books or affairs, and I only examined the reports which it made to the comptroller, whose duty it was to see that those reports were correct." He never requested any of his co-directors, or any officer of the bank, to call a meeting of the board of directors, for, said he, "that duty was devolved upon the cashier." Lastly, and as sufficient evidence that the directors abandoned to Lee the absolute control of all the bank's affairs and forebore to exercise the slightest control or supervision over him or them, only two meetings of the directors were held from October 3d, 1881, until the bank closed its doors on the 14th of April, 1882, *over the whole of which period the dishonest practices of Lee extended;* one, December 12th, 1881, for the purpose only of passing resolutions relating to the death of Charles T. Coit, and the other, January 10th, 1882, when Spaulding and Johnson were made directors. One of the by-laws provided for regular meetings of the board of directors on the first Tuesday in every month. But he had no knowledge of such a by-law or of any such meetings. It is plain from the evidence that if, with his long experience in banking business, he had given one hour, or at the utmost a few hours' time, in any week while he was director, to ascertain how this bank was being managed, he would have discovered enough that was wrong and reckless to have saved the association, its stockholders and depositors, many, if not all, of the losses thereafter occurring. Upon his theory of duty, the only need for directors of a national bank is to meet, take the required oath to administer its business diligently and

honestly, turn over all its affairs to the control of some one or more of its officers, and never go near the bank again, unless they are notified to come there, or until they are informed that there is something wrong. And when it is ascertained that these officers or some of them, while in full control, have embezzled or recklessly squandered the assets of the bank, the only comfort that swindled stockholders and depositors have is the assurance, not that the directors have themselves diligently administered the affairs of the bank, or diligently supervised the conduct of those to whom its affairs were committed by them, but that they had confidence in the integrity and fidelity of its officers and agents, and relied upon their assurance that all was right. No bank can be safely administered in that way. Such a system cannot be properly characterized otherwise than as a farce. It cannot be tolerated without peril to the business interests of the country.

We are of opinion that when the act of Congress declared that the affairs of a national banking association shall be "managed" by its directors, and that the directors should take an oath to "diligently and honestly administer" them, it was not intended that they should abdicate their functions and leave its management and the administration of its affairs entirely to executive officers. True, the bank may act by "duly authorized officers or agents," in respect to matters of current business and detail that may be properly intrusted to them by the directors. But, certainly, Congress never contemplated that the duty of directors to manage and to administer the affairs of a national bank should be in abeyance altogether during any period that particular officers and agents of the association are authorized or permitted by the directors to have full control of its affairs. If the directors of a national bank choose to invest its officers or agents with such control, what the latter do may bind the bank as between it and those dealing with such officers and agents. But the duty remains, as between the directors and those who are interested in the bank, to exercise proper diligence and supervision in respect to what may be done by its officers and agents.

As to the degree of diligence and the extent of supervision, to be exercised by directors, there can be no room for doubt under the authorities. It is such diligence and supervision as the situation and the nature of the business requires. Their duty is to watch over and guard the interests committed to them. In fidelity to their oaths, and to the obligations they assume, they must do all that reasonably prudent and careful men ought to do for the protection of the interests of others intrusted to their charge.

In respect to the dealings of a bank with others this court has said : "Directors cannot in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known, in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." *Martin* v. *Webb*, 110 U. S. 7, 15. A rule no less stringent should be applied as between a banking association and directors representing the interests of stockholders and depositors. Subscriptions to the stock of a banking association, and deposits with it, are made in reliance upon the statutory requirement, which cannot be dispensed with, that its affairs are to be managed and adminis- tered by a board of directors, acting under oath and with such diligence as the situation requires.

In *Cutting* v. *Marlor*, 78 N. Y. 454, 460, Chief Justice Church, delivering the unanimous judgment of the court, said : "A corporation is represented by its trustees and managers; their acts are its acts, and their neglect its neglect. The employment of agents of good character does not discharge their whole duty. It is misconduct not to do this, but in addition they are required to exercise such supervision and vigilance as a discreet person would exercise over his own affairs. The

bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a continuous course of fraudulent practice, especially those so openly committed and easily detected as these are shown to have been. Here were no supervision, no meetings, no examination, no inquiry." This case was referred to, with approval, in *Preston* v. *Prather*, 137 U. S. 604, 614. So in *Hun* v. *Cary*, 82 N. Y. 65, 71, which involved the question of the degree of diligence to be exercised by directors of a savings bank, Judge Earl, speaking for the whole court, said: "Few persons would be willing to deposit money in savings banks, or to take stock in corporations, with the understanding that the trustees or directors were bound only to exercise slight care, such as inattentive persons would give to their own business, in the management of the large and important interests committed to their hands. When one deposits money in a savings bank, or takes stock in a corporation, thus divesting himself of the immediate control of his property, he expects, and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property, will exercise ordinary care and prudence in the trusts committed to them — the same degree of care and prudence that men prompted by self interest generally exercise in their own affairs. When one voluntarily takes the position of trustee or director of a corporation, good faith, exact justice, and public policy unite in requiring of him such degree of care and prudence, and it is a gross breach of duty — *crassa neglegentia* — not to bestow them." *Ackerman* v. *Halsey*, 37 N. J. Eq. 356, 361; *Halsey* v. *Ackerman*, 38 N. J. Eq. 501, 510; *United Society of Shakers* v. *Underwood, &c.*, 9 Bush, 609, 621; *Horn Silver Co.* v. *Ryan*, 42 Minnesota, 196; *United States* v. *Means,* 42 Fed. Rep. 599, 603; *Delano* v. *Case*, 121 Illinois, 247, 249; *Percy* v. *Millaudon*, 3 La. 568, 591; *Marshall* v. *F. & M. Savings Bank of Alexandria, &c.*, 85 Virginia, 676, 684; *Building Fund Trustees* v. *Bossieux*, 3 Fed. Rep. 817.

The case of *Charitable Corporation* v. *Sutton, &c.*, 2 Atk. 400, 405, 406, which involved questions of the liability of directors of a corporation for alleged breaches of trust, fraud

Dissenting Opinion: Harlan, Gray, Brewer, Brown, JJ.

and mismanagement, is very instructive upon this general sub-. ject. Among the objects of the corporation was the lending of money upon pledges, etc., and banking with notes payable on demand within the amount of its stock. One of the breaches of duty complained of was non-attendance by com- mittee-men or directors upon their employment. While con- ceding that the employment was not one affecting the gov- ernment, Lord Chancellor Hardwicke said: "I take the employment of a director to be of a mixed nature; it partakes of the nature of a public office, as it arises from the charter of the crown. . . . Therefore committee-men are most prop- erly agents to those who employ them in this trust, and who empower them to direct and superintend the affairs of the corporation. In this respect they may be guilty of acts of commission or omission, of malfeasance or nonfeasance." Referring to malfeasance or nonfeasance upon the part of directors, he said: "To instance, in non-attendance; if some persons are guilty of gross non-attendance and leave the man- agement entirely to others, they may be guilty by this means of the breaches of trust that are committed by others. By accepting of a trust of this sort, a person is obliged to execute it with fidelity and reasonable diligence; and it is no excuse to say that they had no benefit from it, but that it was merely *honorary;* and therefore they are within the case of common trustees. Another objection has been made, that the court can make no decree upon these persons which will be just, for it is said every man's non-attendance or omission of his duty is his own default, and that each particular person must bear just such a proportion as is suitable to the loss arising from his particular neglect, which makes it a case out of the power of the court. Now, if this doctrine should prevail, it is indeed *laying the axe to the root of the tree.* But if, upon in- quiry before the master, there should appear to be a supine negligence in all of them, by which a gross complicated loss happens, I will never determine they are not all guilty. Nor will I ever determine that a court of equity cannot lay hold of every breach of trust, let the person be guilty of it either in a private or public capacity." So, in *Land Credit Company*

*of Ireland* v. *Lord Fermoy*, L. R. 5 Ch. 763, 770, Lord Hatherley said: "I am exceedingly reluctant in any way to exonerate directors from performing their duty, and I quite agree that it is their duty to be awake, and that their being asleep would not exempt them from the consequences of not attending to the business of the company."

The observations of Lord Chancellors Hardwicke and Hatherley were referred to, with approval, by the Court of Errors and Appeals of New Jersey in *Williams* v. *McKay*, 40 N. J. Eq. 189, 201, where Chief Justice Beasley, speaking for the court, said: "I entirely repudiate the notion that this board of managers could leave the entire affairs of this bank to certain committee-men, and then, when disaster to the innocent and helpless *cestui que trustent* ensued, stifle all complaints of their neglects by saying, we did not do these things, and we know nothing about them. . . . The misconduct in question was manifested in frequent, glaring instances, and it is not easy to imagine how they, or some of them, failed to be discovered by these boards of managers, on the supposition which, in their favor, the law will make, that they exercised their office in this respect with a reasonable degree of vigilance. The neglectful acts in question cannot be regarded by the court as isolated instances, for they run through the whole period of the life of the institution, and thus evince a systematic and habitual disregard of the directions of the company's charter and a very striking indifference to the security of the money held in trust by them."

These salutary doctrines, if applied to the present case — as, in our judgment, they ought to be — require a reversal, with directions that a decree be entered adjudging Elbridge G. Spaulding, Francis E. Coit's estate and W. H. Johnson liable for such losses occurring during the period in question, as could have been avoided by the exercise of reasonable diligence upon the part of said Coit, Johnson and Spaulding, respectively, in performing the duties appertaining to them as directors. The case is one, of supine, continuous negligence, upon the part of the three directors named, in the discharge of duties they owed to the bank and to those interested in it.

No usage of a national bank, nor any authority to carry on its business through executive officers and agents, will relieve its directors from the duty imposed upon them by law of diligently managing and diligently administering its affairs, and actively supervising the conduct of its officers and agents. There was here no diligence, no supervision, but absolute inaction in respect to the affairs of the bank.

It was said at the bar that if such a rule be rigidly applied, a gentleman of property and means would hesitate long before accepting the position of director in a banking association. This could not be the result if gentlemen of that class, becoming directors of such institutions, would exercise anything like the care and supervision they or any other prudent, discreet persons give to the management of their own business. They ought not, by accepting and holding the position of directors, to give assurance to stockholders and depositors, whose interests have been committed to their control, that the bank is being safely and honestly managed, without doing what prudent men of business recognize as essential to make such an assurance of value. A banking corporation, publicly avowing that its business was to be wholly administered by executive officers, and that the directors would have nothing in fact to do with its management, would not long retain the confidence of stockholders and depositors; a fact which, of itself, shows that the abdication by directors of their duties and functions not only tends to defeat the object for the creation of such an institution, but puts in peril the interests of stockholders and depositors.