## HAYES *v.* BEARDSLEY.

*(Supreme Court, General Term, Fifth Department. January 22, 1892.)*

NATIONAL BANKS—PAYMENTS IN CONTEMPLATION OF INSOLVENCY.

Payment of a certificate of deposit by an insolvent national bank more than six weeks before its suspension, and at a time when it was in apparent good standing, and its insolvency known only by its cashier, who fraudulently concealed it, and when there was no evidence to show an intent on the part of the cashier to give preference to the depositor, is not void, under Rev. St. U. S. § 5242, providing that all payments by a national bank, made in contemplation of insolvency, with a view of preferring a creditor, are void.

Appeal from special term, Cayuga county.

Action by Frank M. Hayes, receiver of the First National Bank of Auburn, against Nelson Beardsley. Plaintiff appeals from a decision entering judgment for defendant, without a jury, and dismissing the complaint upon the merits. Affirmed.

Argued before DWIGHT, P. J., and MACOMBER and LEWIS, JJ.

*S. E. Payne,* for appellant. *William F. Cogswell* and *William N. Cogswell,* for respondent.

MACOMBER, J. The plaintiff is the receiver of the First National Bank of Auburn, N. Y., a banking association organized under the statutes of the

United States. He brought this action to recover the amount paid for three certificates of deposit which had been issued by the First National Bank of Auburn, and the ground upon which such recovery is sought is that the payment thereof was in violation of section 5242 of the United States Revised Statutes. It is important, therefore, to state exactly the terms of that statute. That statute is as follows: "Sec. 5242. All transfers of the notes, bonds, bills of exchange, or other evidence of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors, and all payments of money to either,—made after the commission of any act of insolvency, or in contemplation thereof, made with a view to preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void," etc. The trial justice has found, as matter of fact, that this bank continued the ordinary business of banks, in the usual way, up to and including Saturday, the 21st day of January, 1888, on which day, at 12 o'clock noon, its doors were closed, in accordance with the custom of other banking institutions of the city of Auburn, where this bank was located, to close at that hour, on Saturday, in pursuance of the half-holiday law enacted by the legislature of the state of New York; that on the 23d day of March, 1887, the bank, being indebted to the defendant in the sum of $15,000, with interest thereon from the 20th day of December, 1886, upon two certificates of deposit dated, respectively, December 22, 1883, and December 27, 1883, paid and took up such certificates of deposit by transferring to the owner thereof certain negotiable paper which the bank held, to the amount due and unpaid upon the certificates, less the sum of $506.60, which last-named sum was paid in cash, and the notes and the cash were received by the defendant in full payment and extinguishment of the certificates of deposit; that this payment was voluntarily made by the bank, without demand or request by the defendant, and upon the ground, as stated by the cashier of the bank, that his directors did not like to pay so large a rate of interest as these certificates bore, which was 6 per cent. per annum, payable semi-annually. On the 5th day of December, 1887, the bank was indebted to the defendant, upon a like certificate, in the sum of $10,000, bearing like interest. On that day the defendant transferred such certificate to the Cayuga County National Bank, of which the defendant was the president; and that sum, with accrued interest, was credited to him upon the books of that bank. Subsequently, but on the same day, the First National Bank paid the amount of this certificate to the Cayuga County National Bank, in settlement of exchanges between the banks, in the usual course of business. This payment was made, as the court finds, by the paying teller of the First National Bank, who at that time had no knowledge or suspicion that the First National Bank was insolvent, or unable to pay all debts and obligations in full, in the usual course of business. In regard to both transactions the finding is made specific, that these payments were not made with a view to prevent the application of the assets of the bank in the manner prescribed by the national banking act, or with a view to give preference to the defendant over any other creditor of the bank. The further fact is found, that up to and including Saturday, the 21st day of January, 1888, the First National Bank was in good credit as a banking institution, and that up to that time the business public in the city of Auburn had not, nor had any of the officers of the bank, other than its cashier, any knowledge or suspicion that the bank was insolvent and unable to pay its debts and obligations in full as they matured; that the first knowledge or suspicion on the part of the officers, other than the cashier, of the bank or of the defendant, was the absconding of the cashier and of a book-keeper of the bank on the afternoon of Saturday, the 21st of January, 1888, or on the next day. It is further found that the bank

committed no act of insolvency prior to the 21st day of January, 1888, and that the payment of the three certificates was not, nor was the payment of either of them, made after the commission of any act of insolvency, or in contemplation thereof.

The principal question in this case is one of fact. It will be noted that the trial justice has in his findings negatived, in all its parts, the claim made that the payment of the certificates was made in violation of the above-quoted provision of the federal law. An examination of the evidence has led our minds to the same conclusion. Many suspicious circumstances are adduced by the learned counsel for the appellant, from which it is earnestly argued that the defendant had knowledge that the bank was insolvent at all of these times. Several witnesses have testified to declarations of the defendant made subsequently to the failure of the bank. The plaintiff himself testified that the defendant told him that, at the time of receiving these payments, he thought the First National Bank was hard up, and another witness testified that the defendant told him that he (the defendant) had advised the president against longer retaining the cashier, because he played poker; to another witness, that he did not draw all of his money at the time because the cashier could not pay it, or did not want to pay it; to another witness, that he should not lose a great deal, as he had drawn out, at intervals, something like $30,-000 that he had in the bank in certificates, and that, if he had drawn it all out at one time, it would have looked suspicious, and excited talk and comment. All of this testimony, relating to the defendant's declarations, is either denied or explained by him in his evidence. There is the further fact that he had at one time been a director of the First National Bank, and had withdrawn from it upon the ground, as stated by him, according to one witness, that he did not like the management of the bank. Stress is also put upon the fact that he had been loaning for some time to this bank the sum of $50,000, and the bank was paying thereon as much interest as it could lawfully receive for loans made by it; and consequently, it is argued, the defendant must be charged with knowledge that the bank was not properly managed, and was in embarrassed circumstances. On the other hand, in respect to the first two certificates, it is shown that the transaction was 10 months before the bank closed its doors on the flight of the cashier, after a series of embezzlements by him; and, in respect to the third certificate, the fact that it was paid, not to Mr. Beardsley, in person, but to the bank where he had deposited it, and of which he was president, in the regular course of business of settling exchanges, and the further fact that the defendant had still on deposit there, at the time of the bank's failure, the sum of $20,000. This, and other circumstances which might be mentioned, coupled with the positive testimony of the defendant in respect to his knowledge or intention, make a case upon the question of fact where, considering the nature of the testimony against the defendant, which is mainly that of his subsequent declarations testified to by other persons, the preponderance of the evidence appears to be on the side of the defendant, and consequently, upon the question of fact, we must concur with the conclusion reached by the learned trial justice.

It is argued, however, by the learned counsel for the plaintiff, that under this statute, so long as the cashier knew of the condition of the bank, and these payments were made when the bank was in fact insolvent,—as it clearly was at the time of the payment of the first certificates, and for a considerable time prior thereto, as well as at the time of the payment of the last certificate, —it is not material whether the defendant knew of the real condition of the bank or not, but that under this statute an absolute liability against the defendant attaches. He cites upon that branch of his argument the case of *Bank* v. *Butler,* 129 U. S. 223, 9 Sup. Ct. Rep. 281. But that case, in its facts, materially differs from the one now under consideration. In the case relied upon by counsel the insolvency of the bank was well known to its offi-

cers, and the payment was there actually made by the bank for the purpose of giving a preference. In this case, no officer of the bank, except the cashier, who was also a director, knew of the bank's actual condition; on the contrary, it had been fraudulently concealed from them, and the concealment seems to have been so completely made that the bank examiner, visiting the bank a few days before its collapse, did not find out its true condition. In the case cited the contemplated insolvency of the bank followed immediately upon payment to the preferred creditor. The inference to be drawn from acts so nearly simultaneous is quite different from that to be adduced where the lapse of time between the acts is so great as is shown to have been in this case. If any one of the payments was made with a fraudulent intent on the part of the cashier to give a preference to this defendant, that fact has not been shown. Other inferences in regard to the motive of the cashier in paying off these certificates may be readily drawn, as that he intended to give the defendant a preference. Being engaged a long time at deliberate embezzlement of the bank's funds, he naturally would try, by his actions, to lead such an extensive lender of money as the defendant into a belief that the bank was prospering; and no better means to that end, probably, could have been adopted than the voluntary payment by him of a portion of the bank's indebtedness to the defendant, coupled with the notice that the bank did not like to pay such high rate of interest. There is a failure of proof, as it seems to us, of any facts actually tending to show a preference in the payment of these sums of money to the defendant. As the court say in *Curtis* v. *Leavitt*, 15 N. Y. 198: "The intent to give a preference, and either an actual insolvency or a contemplation of insolvency, must be proved as facts. The intent and contemplation of insolvency may be proved either by direct evidence, or inferred as the necessary consequence of other facts clearly proved. If insolvency is relied upon to defeat the securities, knowledge of the insolvency by the directors of the company, or a belief by them that it existed at the time the securities were made, must be proved; for an intent to give a preference to particular creditors, in fraud of all other creditors of the company, cannot be conceived, except as connected with a knowledge or belief that the company is insolvent, or with a contemplation of its insolvency. It is the intent to give a preference in violation of the statute, and in fraud of the general creditors of the company, which stamps the conveyance or assignment with criminality," etc. See, also, cases there cited. It seems to us that payments cannot be said to be "made after the commission of an act of insolvency, or in contemplation thereof," when they were made, not by the bank, with knowledge by its directors of its actual condition of insolvency, so far as could be ascertained by the directors of the bank in the regular course of business of a solvent institution, but by the cashier alone, and that such a payment cannot "be said to have been made with a view to the preference of one creditor to another" when made under the circumstances disclosed in this case. Nor does the circumstance that the defendant was a director of the First National Bank up to the beginning of the year 1887 make, under these proofs, his liability in this action any more manifest, even though the bank was actually insolvent at that time, or render him liable to pay back the moneys received by him in the manner stated, so long as he acted in good faith, whatever may have been the misconduct and motive of the cashier; for he, while a director, as well as the other directors and officers of the bank, was deceived by the cashier as to the bank's true condition, and not absolutely liable for the latter's misconduct. As the court said in *Credit Co.* v. *Fermoy*, L. R. 5 Ch. App. 763: "Whatever may be the case with a trustee, a director cannot be held liable for being defrauded. To do so would make his position intolerable." *Briggs* v. *Spaulding*, 141 U. S. 132, 11 Sup. Ct. Rep. 924.

Judgment appealed from should be affirmed. All concur.