**Hylton HARMAN, Trustee of Estate of Coffeyville Loan and Investment Company, Inc., Plaintiff,**

v.

**D. A. WILLBERN, Defendant.**

**Civ. A. No. KC–1963.**

United States District Court, D. Kansas.

April 4, 1974.

------◆------

Harold H. Harding, Thomas E. Joyce, Kansas City, Kan., for plaintiff.

T. Richard Liebert, Coffeyville, Kan., for Creditors' committee.

Blake A. Williamson, Williamson, Cubbison, & Hardy, Kansas City, Kan., Lamb & Lamb, Paul A. Lamb, Coffeyville, Kan., A. C. Cooke, Shawnee Mission, Kan., for defendant.

Joe L. Grant, Chicago, Ill., for Securities & Exchange Comm.

## DECISION OF THE COURT

THEIS, District Judge.

The plaintiff, Hylton Harman, is the duly appointed, qualified and acting trustee of Coffeyville Loan and Investment Company, Inc., hereinafter referred to as CLIC, which was reorganized under Chapter X of the Federal Bankruptcy Act. On July 1, 1963, the plaintiff was authorized to bring this action against the defendant, seeking damages for the alleged breach of his fiduciary duties owing to CLIC's creditors and minority stockholders. Harman v. Willbern, 227 F.Supp. 892 (D. Kan.1964). This litigation has existed through the years and been the subject of many a hotly contested hearing between the partisans on both sides. At least two federal judges have been assigned the case and made various orders therein. There have been at least three trustees and three sets of attorneys for the various trustees. Bitter debate and division of legal opinion has existed on whether the case was meritorious. To resolve the acrimony and to complete the litigation, this case was finally tried to the Court over a year ago, transcripts of the evidence have finally become available, and the hour of decision has arrived. The complaint alleges two causes of action: (1) negligence in the sale of CLIC to Donald R. Elbel; and (2) negligence in defendant's actions as a director of CLIC while he remained on the board of directors following the sale.

Upon stipulation of the parties, the issue of liability was tried to the Court, and a determination of damages was postponed pending resolution of plaintiff's underlying claims. It is stipulated that venue is properly laid in this District; that the United States District Court for the District of Kansas has jurisdiction over the parties and the subject matter; and that all proper, necessary and indispensable parties are present. Having reviewed the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Rule 52, Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. The Coffeyville Loan and Investment Company, Inc. (CLIC) was a financial institution in Coffeyville, Kansas, organized in 1937 as a private corporation for profit under the laws of the State of Kansas. From its inception, CLIC's principal source of capital was derived from the sale of investment certificates and preferred stock to the public. At the time of its sale in 1958, CLIC had outstanding: $1,689,845.00 of investment certificates; $73,788.00 of CLIC notes issued to the public; $148,100.00 of issued preferred Class "A" and "B" stock; and the par value of the issued common stock was $360,000.00, with an earned surplus of $35,064.00, and a capital surplus of $125.00, making a total capital account for the common stock aggregating $395,189.00. The defendant, D. A. Willbern, was the majority stockholder, creative force, and controlling person of CLIC prior to his transfer of its control.

2. Originally, the company was primarily engaged in the business of making chattel loans. The business, however, was continually expanded. At the time of the transfer of ownership, the

company had an extensive chattel loan business, it made some direct real estate loans, it had a large insurance department, and it was extensively engaged in the business of making and servicing real estate loans for large corporate investors. One of the principal assets of the company at the time of the transfer was a wholly owned subsidiary, Pepsi-Cola Mo-Kan Bottlers Inc., operating five Pepsi-Cola bottling plants.

3. As of January, 1958, CLIC had an approximate book value, consisting primarily of its common stock, of $407,000.-00. Additional assets, not included in CLIC's book value, consisted of: (1) an insurance agency enterprise valued at between $80,000.00 and $108,000.00; (2) a mortgage servicing business valued at between $210,000.00 and $280,000.00; and (3) the Pepsi-Cola bottling franchises valued at approximately $250,-000.00. CLIC's assets generated an approximate annual net income of $111,-500.00.

4. At this same time, CLIC's outstanding obligations, comprised primarily of interest due its investors, totaled approximately $85,000.00 annually; the intangible value of CLIC's mortgage servicing business was deteriorating; and several large accounts were delinquent. In addition, the Pepsi-Cola franchises were suffering large operating losses necessitating substantial and reoccurring cash advances which the company was precluded from providing.

5. Practically simultaneously with the incorporation of Coffeyville Loan and Investment Company, the defendant and others obtained a charter for the First Federal Savings and Loan Association, starting the business with an initial capital outlay of $11,000.00 in cash and $75,000.00 in subscriptions. At the time of the defendant's retirement, assets of the First Federal Savings and Loan totaled $70,000.00 and have since increased to approximately $86,000.00.

6. Following the incorporation and expansion of CLIC, defendant employed C. H. Carrington as manager of the chattel, personal loan and insurance departments, and Cale Oden as manager in charge of origination, sales and servicing of real estate mortgages. Both of these individuals were officers and directors of CLIC prior to and subsequent to the sale of the company.

7. During the years 1955, 1956 and 1957, the defendant's personal activities in CLIC were somewhat curtailed, supervisory in nature, and additional responsibilities were conferred upon Carrington and Oden due, in large part, to the growth of First Federal Savings and Loan, which was occupying a substantial portion of the defendant's time.

8. At some point during 1956, because of the added responsibilities in connection with First Federal Savings and Loan, and the further fact that the defendant had no one in his family to succeed him in CLIC, the defendant and members of CLIC's board decided to sell the company to an experienced mortgage banker.

9. Mr. Willbern listed Coffeyville Loan and Investment Company for sale with Robert Demming for the sum of $750,000.00, out of which Mr. Demming was to derive a commission. Mr. Demming, who had operated a successful mortgage banking organization in the territory at Oswego, Kansas, had sold the same to Charles F. Curry Company, and was then associated with the Curry Company.

10. At a national mortgage banking meeting in the latter part of 1957, Mr. Willbern was approached by a Mr. Donald R. Elbel with reference to the possibility of the sale of CLIC. Mr. Willbern knew Mr. Elbel to be a mortgage banker and president and member of the board of directors of the Charles F. Curry Company.

11. Mr. Willbern was advised that Mr. Elbel, as a vice president and subsequently president of the Charles F. Curry Company, had increased the mortgage servicing of the Curry Company from $14,000,000.00 to $175,000,000.00; that Elbel and Charles F. Curry, his father-in-law, owned the Elbel Construction

Company, which was building homes and providing additional mortgages for the Curry Company; that the net worth of Elbel was in excess of $1,000,000.00; that the net worth of the Elbel Construction Company was between $400,000.00 and $500,000.00; that Elbel had extensive credit with First National Bank of Kansas City, Missouri, First National Bank of Boston, Massachusetts, Chase Manhattan Bank of New York, Security National Bank of Kansas City, Kansas, and other banks. Accordingly, Wilbern felt that Elbel would be in a position to substantially increase the business of Coffeyville Loan and Investment Company for the company and its investors.

12. For the protection of the stockholders and the investors of CLIC, Willbern checked Elbel's general business reputation by personally contacting Mr. Daman Bowersock, vice-president of the First National Bank, Kansas City, Missouri; Mr. Maurice Breidenthal, Sr., president of the Security National Bank, Kansas City, Kansas; and Mr. John Burford, president of Security National Bank of Miami, Oklahoma, who in turn checked with the First National Bank of Kansas City, Missouri, and the First National Bank of Boston, Massachusetts.

13. Each of the bankers contacted by Willbern reported that Mr. Elbel had a reputation as an agressive, honest businessman; that he was a capable executive experienced in the mortgage banking field; that he possessed outstanding credit with a number of large banking institutions; and that he would make an excellent purchaser of CLIC.

14. Mr. Willbern did not, however, inquire of Mr. Edward A. Huwalt of the First National Bank of Kansas City, Missouri, who handled Mr. Elbel's loans. Although stating that any response to questions regarding a client would have been guarded, Mr. Huwalt testified that, upon inquiry, he would have reported that Mr. Elbel's personal credit risk as well as that of his construction company was poor, although in relationship to the Curry Company it was very good.

15. Mr. Willbern did not at any time request or inspect a financial statement of either Elbel personally or the Elbel Construction Company. In addition, he did not require the disclosure of the purchaser's books, records and financial arrangements.

16. Based upon the information available to him, Mr. Willbern entered into an agreement to sell his interest in CLIC, comprised primarily of the common stock, to the Elbel Construction Company or to any subsidiary it might create, for a total purchase price of $720,000.00. The sale was consummated on January 16, 1958.

17. Rather than accept full payment in cash from the purchaser, Mr. Willbern elected to accept an initial cash payment of $420,000.00. To effect the ultimate transfer of control, Mr. Willbern agreed to cause CLIC to reduce its common voting stock from $360,000.00 par value to $60,000.00 par value and immediately transferred all of the $60,000.00 voting stock for the $420,-000.00. The agreement also provided for the issuance to Willbern and his associates of $300,000.00 of a new Class "C" preferred stock of CLIC; for the retirement of this Class "C" preferred stock; and for the retirement of all the $68,000.00 of Class "A" and "B" preferred stock held by Willbern, his family and associates. No provision was made for retirement or redemption of Class "A" and "B" preferred stock held by others not associated with Willbern. To assure the retirement of this new Class "C" preferred stock and the "A" and "B" preferred stock held by him and his associates, Willbern caused an asset of CLIC, to-wit: the stock held by CLIC in Pepsi-Cola Mo-Kan Bottlers Inc., to be pledged as security for such retirement. The Pepsi-Cola stock was placed in escrow at the First National Bank of Coffeyville under an escrow agreement executed by Willbern individually. The effect of this arrangement was to subordinate the interest of CLIC's depositors and public preferred stockholders in the Pepsi-Cola asset to the interest of the

holders of the new Class "C" and preferred "A" and "B" stock.

18. Prior to the actual transfer on February 7, 1958, of the control from Willbern to Wadsworth Acceptance Co. (a subsidiary of Elbel Construction Company), and acting pursuant to directions from Donald R. Elbel (controller of the new purchaser), the defendant Willbern caused to be sold the listed common stocks held in the portfolio of investments of CLIC. This was done pursuant to a statement by Donald R. Elbel to Willbern that in the future CLIC would not be in the business of owning common stocks. The liquidation of these common stocks by the defendant Willbern prior to the sale produced over $100,000.00 in cash for CLIC within a few days before and after the time of the transfer.

19. Under the terms of the sale agreement, financial statements of CLIC as of October 31, 1957, were presented to Elbel Construction Company by D. A. Willbern for the protection of the purchaser. Representations and warranties were made by Willbern of the financial condition of CLIC; provisions were contained in the contract for CLIC to open its books and records and to examine officers and employees of CLIC so that an independent investigation could be made by Elbel Construction Company of the affairs of CLIC; and this was done.

20. There were no provisions in the contract for production of financial statements by the purchaser Elbel Construction Company for the benefit of CLIC or its depositors. There were no provisions in the contract to protect CLIC or its depositors by providing for the investigation of the business operations and financial condition of Elbel Construction Company; nor for an investigation of its capacity to purchase, finance, operate and protect the capital invested by investment certificate holders and preferred Class "A" and Class "B" stockholders in CLIC; nor for an independent audit or investigation of the affairs of the purchaser Elbel Construction Company or its controlling person,

Donald R. Elbel; nor for the protection against erosion of the assets of CLIC. The actual transfer of stock was made to Wadsworth Acceptance Corporation, a subsidiary created by Elbel Construction Company, to receive the $60,000.00 controlling common stock of CLIC in return for the cash payment to Willbern of $420,000.00.

21. The evidence produced by the plaintiff disclosed that had Willbern obtained a financial statement of Elbel Construction Company at the time of the transfer of control of CLIC he would have seen that the bulk of the assets of the construction company consisted of housing under construction in the Kansas City area which was subject to construction loan mortgages. Furthermore, a financial statement would have disclosed that the cash and liquid assets of the Elbel Construction Company itself were small in relation to its accounts payable, and that Elbel Construction Company would not have been able to pay the $420,000.00 promised under the purchase agreement from its own resources. Admittedly, a logical source for obtaining the needed cash was CLIC's liquid assets.

22. In order to insure the orderly transfer of control of CLIC, Mr. Willbern remained on the board of directors from February 7, 1958, to August 28, 1958. Although Mr. Willbern signed a waiver of notice of board of director's meetings of CLIC on February 7, 1958, the day the sale was completed, no meetings were ever held between February 7, 1958, and August 28, 1958, and Mr. Willbern was never requested to sign another waiver of meetings.

23. During the time Mr. Willbern remained on the board of directors of CLIC, "in name only," he would periodically check with Mr. Carrington and Mr. Oden, both of whom were retained as officers and directors of CLIC. They would consistently report encouraging information about the progress of the company, including the fact that the mortgage servicing business had been increased from $14,000,000.00 at the

time of the sale to $23,000,000.00. Mr. Willbern devoted his time exclusively to managing the affairs of the First Federal Savings and Loan Company, an institution located in the building immediately adjacent to CLIC's offices.

24. Following the transfer of control, a significant change in the method of disbursements of substantial funds was the use of the system of sight drafts drawn on the Coffeyville bank account of CLIC by various companies controlled by Elbel in Kansas City. During the period that Willbern remained on the board of directors after the transfer of the company to the control of Donald R. Elbel, 108 such drafts were drawn during a period of 194 days transmitting to Elbel controlled companies or to or for their affiliates $1,528,757.60. Notice of the disbursements of such sums was in the sight drafts, the bank statements, the correspondence file, the draft register book, and the ledger accounts, all of which were maintained in the Coffeyville office.

25. Another substantial change after the sale was that the liquid portfolio of the chattel and personal loans which was the principal business and investment of CLIC was sold to The First National Bank of Pueblo, Colorado, under a contract transferring all of these assets out of CLIC. The total cash realized from the sale of this portfolio was $657,081.-00. The effect of such a transfer was to allow the controller through cash advances to reduce the protection to CLIC afforded by a widely diversified portfolio (as of January 1, 1957, totalling $1,254,563) to a dependence on the credit of a single debtor and controlling person owing CLIC notes receivable of $710,235.00.

26. By use of documentary evidence compiled and reviewed over a number of years after the fact, the plaintiff established the following transactions during the period Mr. Willbern remained on the board of directors:

A. Beginning seven days after transfer of control, large movements of cash went out of CLIC to Elbel Companies or their affiliates or for payment of accounts which they owed to creditors, particularly trade accounts which were lienable items on the construction projects; that within thirty days after the transfer, $312,004.59 had been moved and within seven months, $1,528,758.21 had moved to Elbel companies or its affiliates; that the collateral for these advances was not adequate to secure CLIC, and in many instances there was no collateral with CLIC when the cash was disbursed. Large sums had been advanced on second mortgages on constrution projects junior to outstanding claims of trade accounts. Sums had been advanced merely on assignments by tradesmen of their accounts against Elbel controlled companies. Stock in apartment house corporations of little or no marketable value had been sold to CLIC contrary to Elbel's statement to Willbern before the transfer that he wanted Willbern to sell the listed stock of CLIC because the company was not to be in the business of "owning stocks." The movement of this money was through various accounts on the records of CLIC; one of which was a suspense account. These accounts reveal substantial transactions made as an accounts receivable with no collateral. The receipts from or on account of the companies during the seven months period was less than half of the advances and in many instances constituted "in and out" transactions.

B. By the time Willbern resigned from the board of directors on August 28, 1958, a balance of $823,285.00 had been invested in notes of Elbel controlled companies or in the purchase of minority stockholding interests in family controlled companies; these stocks paid no income; the price per share paid by CLIC was five times that paid by Curry to Elbel in the exchanges involving stock in the same companies made in January, 1958, when Charles Curry, Elbel's father-in-law and former employer, and Elbel severed their business relationships.

C. Between January 31, 1958, and August 28, 1958, the chattel and personal loan portfolio of CLIC which had constituted the principal investment of CLIC (maintaining the cash flow to meet the liquidity required for supporting the thirty day demand debts owed to the investment certificate depositors) had been reduced from $1,373,575.00 to $355,819.00.

D. While Willbern remained on the board, losses on the Allen Construction Company bond underwritten by CLIC while Willbern was in control had increased from $34,699.00 to $159,951.00. No reserves had been established to cover this loss and no charge had been made against the capital account of CLIC.

E. The real estate loans during the same period had decreased from $460,921.00 to $59,990.00. This decrease indicated that CLIC no longer had its assets to support a mortgage servicing business.

F. In June, 1958, $31,851.00 cash was raised by CLIC in the sale of certain assets, being certain automobiles which were then leased back to CLIC.

G. On June 2, 1958, and June 4, 1958, there was over $200,000.00 exchanged between CLIC and Wadsworth Homes, and Elbel subsidiary, under memoranda in the "Elbel Construction Co.—Drafts" file indicating a disregard by that time of any real protection of CLIC in the flow of funds to Elbel controlled companies.

H. The real estate mortgages on CLIC owned property had increased to $40,480.00.

I. During the same period proper provisions had not been made for maintaining an adequate reserve for bad debts; large charge offs were made for bad debts greatly exceeding the reserves.

27. The cumulative effect of these changes in the assets of CLIC after transfer of control and during Willbern's directorship thereafter, was to substantially loot CLIC of its readily marketable assets and bankable paper and of its assets which could generate a cash flow sufficient to meet the liquidity requirements of the institution. CLIC was rendered incapable of protecting its depositors with its own assets, and there was no capacity in the Elbel companies to support or supply the needs of CLIC. It was only a matter of time before CLIC would become insolvent and bankrupt. This occurred less than a year later, on July 21, 1959.

28. Both vice president-director Carrington and secretary-director Oden, upon whom Willbern relied for advice before and after the transfer of control, had investments in CLIC which could have been withdrawn at any time. Having confidence in the organization and its management, however, they left their investments in the company and eventually became creditors under Chapter X proceeding.

29. On or about the date of Mr. Willbern's resignation from the board of directors, he and certain members of his family withdrew nominal deposits and placed them in the First Federal Savings and Loan Association. However, "A" and "B" preferred stock in excess of $50,000.00 was left in the company. In July, 1958, Damon Willbern, Jr., purchased a $1,000.00 thrift note with a nine month maturity which was not withdrawn until several months after Mr. Willbern resigned from the board. Mr. Willbern, his immediate family and the family corporation, Sekan Investment Company, eventually lost in excess of $241,000.00 when CLIC filed its Chapter X proceeding.

30. In the bankruptcy proceedings before this Court the trustee, in liquidating certain assets of CLIC, executed a release of Donald R. Elbel and his wife after a hearing in which it was determined that he had no financial resources against which the trustee could recover any losses. This was a fact established before the Court approved the release. At no time was the defendant Willbern released from any liability, directly.

31. The plaintiff did not produce any competent evidence establishing that the purchase price obtained by Mr. Willbern in return for the transfer of his control in CLIC was inflated. Furthermore, there was no evidence even tending to establish that Mr. Willbern at any time either: (1) was aware of the financial insecurity of Elbel or the Elbel controlled companies; or (2) was aware of Elbel's transactions after obtaining control of CLIC which diminished CLIC's assets and drove it into bankruptcy.

## CONCLUSIONS OF LAW

Based upon the evidence produced in this case, as reflected in the above Findings of Fact, the plaintiff contends that the defendant, D. A. Willbern, breached his fiduciary duty to CLIC, its stockholders and creditors, and therefore should be held liable for the losses sustained, in that: (1) he failed to use due care in the transfer of his control and controlling common stock to Elbel Construction Company, Inc.; and (2) while remaining a director of CLIC, he failed to take any action to prevent the losses sustained by CLIC arising from the actions of the purchaser, Elbel Construction Company, Inc., and its affiliates.

The defendant has consistently maintained that: (1) this action is barred by application of the doctrine of res judicata and, in the alternative (2) the release of Donald Elbel served to also release the defendant from any and all liability arising from the transfer of control and subsequent mismanagement of CLIC. Since the Court has determined that the plaintiff has failed to sustain its burden of establishing the underlying claims for relief, it need not resolve those issues.

Since this is a diversity action seeking personal recovery, the Court would normally be bound to follow the substantive law of the forum in resolving questions of law, i. e., the law of the State of Kansas. See McDaniel v. Painter, 418 F.2d 545, 547 (10th Cir.1969). The plaintiff maintains, however, that the action is not founded merely upon diversity jurisdiction, but also states a cause of action for a violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U. S.C. § 78j(b)), and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5), relying upon Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Accordingly, plaintiff asserts that the Court is bound to follow the generally recognized common law of fiduciary obligations set forth in Insuranshares Corporation v. Northern Fiscal Corporation, 35 F.Supp. 22 (E.D.Pa. 1940), and its progeny. See Jannes v. Micro-Wave Communications, Inc., 461 F.2d 525 (7th Cir.1972). Since the law of Kansas is merely an incorporation of this federal common law, the Court need not make the fine distinction urged by the plaintiff, although the assertion is a valid one.

Common law recognizes two distinct standards of care attributable to majority stockholders transferring control of a corporation and directors of a corporation. Accordingly, the Court will treat the plaintiff's claims separately, seriatim.

### I. *Sale of Control.*

■■ Generally, the shares of stock of a corporation are personal property which may be transferred like any other property, unless the transfer is restrained by the charter or articles of association. Van Demark v. Barons, 52 Kan. 779, 35 P. 798 (1894). Nevertheless, dominant stockholders, such as the defendant in this case, are not free to act in total disregard of the rights and interests of other corporate stockholders and creditors in the sale of their controlling interest. Rather, as admitted by the defendant, a fiduciary duty exists regarding the sale of corporate stock by dominant stockholders, and a breach of that obligation may be redressed by individual stockholder suits. McDaniel v. Painter, *supra*, 418 F.2d at 547.

The parties do not seriously dispute the applicable law. Without question, the leading case is Insuranshares Corporation v. Northern Fiscal Corporation,

**1158**

*supra.* The standard of conduct to which *Insuranshares* holds controlling transferors has been widely accepted. Estate of Hooper v. Govt. of Virgin Islands, 427 F.2d 45, 47 (3rd Cir.1969); McDaniel v. Painter, *supra,* 418 F.2d at 547; Seagrave Corporation v. Mount, 212 F.2d 389, 395 (6th Cir.1954).

■■ Generally, the owner of corporate stock may dispose of his shares as he sees fit. Alderman v. Alderman, 178 S.C. 9, 43, 181 S.E.2d 897, 911 (1935). A dominant or majority stockholder does not become a fiduciary for other stockholders *merely* by owning stock. McDaniel v. Painter, *supra.* In selling their stock, the stockholders necessarily act for themselves, and not as trustees for the other stockholders. Gerdes v. Reynolds, 28 N.Y.S.2d 622, 649 (Sup.Ct. N.Y.Co., 1941). In fact:

> "Inherent in the very nature of stock corporations as constituted by our law are the settled principles that the shares of stock are the property of the stockholders, that the stockholders may sell their shares when and to whom they please and for such price as they can get, that they may sell to buyers of whose identity and integrity and responsibility they are unaware . . . and that these same rights exist even where the stockholders hold a majority of the stock and where the sellers are a group who together own and sell such a majority." Gerdes v. Reynolds, *supra,* 28 N.Y.S.2d at 649.

Nevertheless, majority stockholders who assume the management of the corporation, such as the defendant, can be said to stand in fiduciary relation to the minority under certain circumstances.

The majority rule was perhaps best stated by Judge Winter of the Fourth Circuit Court of Appeals in Swinney v. Keebler Company, 480 F.2d 573, 578 (4th Cir.1973):

> "Thus, while the majority is not an absolute insurer against any wrongs which may be done to the corporation after the transfer of control or against any decisions by the new owners that may not be in the best interest of the minority, if the sellers of control are in a position to foresee the likelihood of fraud on the corporation, including its creditors . . . or on the remaining stockholders, at the hands of the transferee, their fiduciary duty imposes a positive duty to investigate the motives and reputation of the would-be purchaser; and unless such a reasonable investigation shows that to a reasonable man no fraud is intended or likely to result, the sellers must refrain from the transfer of control."

This standard has consistently been adhered to as well as recommended by the leading authorities. See 6 Cavitch, Business Organizations § 120.03 [3] [c], pp. 756, 767; 13 Fletcher Cyclopedia of Corporations, § 5805, p. 99 (Perm.Ed. 1970); Loss, Securities Regulation, pp. 1469–70 (1961 Ed.).

■■ As is evident from the above standard enunciated by Judge Winter, the seller of a majority stockholding does not have a positive duty to investigate the purchaser in a transaction such as present here unless there are circumstances existent "such as to awaken suspicion in a reasonably prudent man." The plaintiff maintains that it need not prove that the defendant had actual knowledge of an intention to loot CLIC in order to establish liability, but that liability is established by a showing that there were sufficient circumstances to put a prudent man on notice that the purchaser was irresponsible and would mismanage and loot the corporate assets, coupled with a failure to investigate the facts surrounding the sale. The Court agrees with this reasoning. As noted in Swinney v. Keebler Company, 329 F. Supp. 216, 223 (D.S.C.1971):

> "To require knowledge of the intended looting on the part of the seller in order to impose liability on him places a premium on the 'head in the sand' approach to corporate sales. . . ."

See also *Insuranshares, supra.*

■ Turning to the facts of this case, it was first incumbent upon the plaintiff to establish that the circumstances surrounding the transfer of defendant's stock in CLIC were such as to alert suspicion in a prudent seller in the defendant's position that the purchaser was likely to mismanage or loot the corporate assets. Proof failing on that issue, the adequacy or inadequacy of the defendant's actual investigation is entirely immaterial. After reviewing the evidence, the Court is satisfied that the plaintiff failed to meet his burden.

Although seemingly suspicious when viewed with hindsight aided by the knowledge of events which actually transpired, the plaintiff's evidence totally failed to establish circumstances surrounding the sale of defendant's interest in CLIC, *which existed at the time of the sale,* to put a prudent man on notice that the purchaser's intentions were anything but honorable. Unlike the facts present in *Insuranshares* and *Gerdes*: (1) CLIC had never been looted in the past, and the defendant had never been warned of any such possibility; (2) the purchaser, Donald R. Elbel, had a reputation for aggressiveness and honesty and had been a successful businessman of public renown; (3) CLIC's assets were neither easily salable nor highly liquid, but rather, consisted primarily of real estate and chattel mortgages, holdings in Pepsi-Cola franchises, equipment, exclusive mortgage servicing contracts, an insurance agency, and some real estate holdings; (4) there was no competent evidence establishing an inflated selling price or demonstrating a bonus, although the actual selling price was perhaps based upon speculative assumptions; and (5) the purchaser's business background and expertise coincided with CLIC's existing and anticipated needs.

Against this outwardly innocuous background, the plaintiff nevertheless asserts that the defendant should have been suspicious that the purchaser would use CLIC's liquid assets for the needs of his other business enterprises to the detriment of CLIC's investors and creditors. The plaintiff reasons that: (1) the defendant knew that CLIC was under considerable financial difficulty and stress just prior to the sale; (2) the defendant knew, or should have known, that there was a need in the construction business for ready cash in order to engage in speculative housing construction projects; (3) the purchase price was too high in light of the sale of a going concern such as CLIC; and (4) the purchase agreement called for an inordinate reduction of CLIC's capital. The Court cannot agree with either the plaintiff's factual assertions or the conclusion he draws therefrom.

Admittedly, CLIC was under some financial stress at the time of the transfer of control, principally because of the strain of funds occasioned by the Pepsi-Cola operational losses. These stresses were not insurmountable, however, or of such a nature as to signal the calamities which ultimately beset the company. As for the plaintiff's remaining assertions, they are entirely conjectural and lacking in evidentiary support.

What can be said from the evidence produced by the plaintiff is that the defendant lacked knowledge concerning the corporate structure underlying the Elbel Construction Company and the subtle intricacies of Elbel's business integrity. Accordingly, had he engaged in a more thorough investigation, his suspicions might have been aroused and the sale not consummated. The plaintiff may not, however, rely upon facts which a thorough investigation would have disclosed to establish circumstances necessitating such investigation. The application of such circular reasoning would place an undue burden on stockholders, contrary to the authorities previously cited, and run counter to the law's policy favoring a free market for goods and businesses. As so aptly stated in Levy v. American Beverage Corporation, 265 App.Div. 208, 38 N.Y.S.2d 517, 526 (1942):

> "To apply the rigid rules limiting a fiduciary, and to say further that the failure to investigate the moral char-

acter, or financial ability of the purchaser of one's stock is an actionable wrong, is to place an unwarranted burden upon the ownership of stock. Knowledge that purchasers were about to loot the corporate treasury, or were persons who had previously engaged in such practices would be one thing. Concluding on the basis of mere lack of knowledge concerning the business integrity of the purchaser that the seller assumes the risk that the buyer has an intention to loot the company would be quite another. The law does not require one to act on the assumption that a person with whom a business transaction, even of large amount, is had, will commit a fraudulent or criminal act if given the opportunity to do so. Quite the contrary may be assumed, in the absence of actual notice."

In summary, the plaintiff has simply failed to establish circumstances rendering the defendant's sale of his controlling interest in CLIC actionable. Although the Court does not endorse the practice of selling controlling stock in a corporation without first requiring disclosure of basic financial information coupled with contractual protection of innocent third parties, as good business practice, it cannot attach liability to the exercise of poor business judgment alone. Accordingly, judgment is rendered for the defendant on plaintiff's first claim for relief.

## II. *Liability of a Director.*

The plaintiff's second claim for relief is more troublesome than the first. The plaintiff contends that the defendant, while remaining on the board of directors of CLIC, abdicated his responsibilities as director of the corporation by turning the entire management over to Donald R. Elbel, who then proceeded to mismanage and loot the corporation of its assets, resulting in CLIC's ultimate bankruptcy. Plaintiff maintains that in so acting, or failing to act, the defendant breached the fiduciary obligation owed to CLIC's investors and creditors, and that he should therefore be held liable for the losses occasioned by such breach.

The evidence established that: (1) the defendant remained on the board of directors "in name only" from February 7, 1958, the date the sale was finally consummated, until August 28, 1958; (2) during this time, no board of directors meetings were held, and the defendant had waived notice of any such meetings; (3) at no time did the defendant demand a meeting of the board or seek an independent evaluation of the corporation's books and records; and (4) the defendant's only contact with the corporation, besides several business transactions, consisted of his inquiries of Mr. Carrington and Mr. Oden, officers of CLIC, who reported that business was growing.

During this same period of time, as previously noted, large sums of money were transferred to Elbel affiliated companies for inadequate collateral; the portfolio of chattel and personal loans amounting to $657,981.00 was sold to the First National Bank of Pueblo, Colorado; real estate loans decreased from $460,921.00 to $59,990.00; proper provisions were not made for maintaining an adequate reserve for bad debts, and large charge offs were made for bad debts greatly exceeding the reserves; and, in general, a diminution of CLIC's marketable assets, bankable paper, and other assets needed to generate a cash flow sufficient to meet the liquidity requirements of the institution had occurred. Approximately eleven months after the defendant's resignation from the board of directors, CLIC was thrown into bankruptcy proceedings.

Basically, the plaintiff contends that CLIC's financial losses and · eventual bankruptcy would not have occurred had the defendant properly fulfilled his duties as a director, rather than merely remaining on the board "in name only." Plaintiff asserts an active and conscientious director would have been aware of Elbel's mismanagement of CLIC's funds and would have: (1) demanded reme-

dies; (2) advised the Kansas Securities Commissioner or the Attorney-General; or (3) initiated an appropriate legal remedy to force disclosure and a return of CLIC's assets before they were beyond reach. Since the defendant admittedly did not assume active participation in CLIC's business affairs, plaintiff maintains that he is liable for the losses occasioned thereby.

The plaintiff does not allege that the defendant is guilty of any self-dealing, fraud, or bad faith, or that he actively participated in or personally profited from the mismanagement of CLIC's assets. Rather, the complaint alleges nonfeasance—liability arising from the defendant's abdication of his fiduciary obligations.

■ The general rule in Kansas regarding the fiduciary obligations of corporate directors was set forth in Beard v. Achenbach Memorial Hospital Association, 170 F.2d 859, 862 (10th Cir. 1948), as follows:

"The directors of a corporation are charged with the duty of managing its affairs honestly and in good faith, and they must exercise ordinary and reasonable care in the performance of their duties. They must act with fidelity to the interests of the corporation, and they are jointly and severally liable for losses of the corporation proximately resulting from bad faith, fraudulent breaches of trust, or gross or wilful negligence in the discharge of their duties." See Noll v. Boyle, 140 Kan. 252, 255, 36 P.2d 330 (1934).

The precise degree of care demanded in a particular case, however, depends upon the subject to which it is to be applied, and each case has to be determined in view of its preculiar circumstances. Briggs v. Spaulding, 141 U.S. 132, 137, 11 S.Ct. 924, 929, 35 L.Ed. 662 (1891). This requires, in the first instance, a delineation of the nature of the institution involved which, in turn, dictates the fiduciary obligations demanded.

In this instance, the defendant assumed responsibilities of a director of a financial institution issuing investment certificates in the form of a passbook similar to those issued for accounts in a savings and loan association or in a savings account of a bank. Although CLIC was not qualified as doing a banking business under K.S.A. § 9–702, or as doing a savings and loan business under K.S.A. § 17–5805, it was nevertheless at all times actively engaged in soliciting and accepting deposits of money from the public.

By the very nature of the business carried on by CLIC, the public necessarily placed its trust in the honesty, integrity, and business acumen of the corporation's directors. Conversely, by accepting the public's investments, the directors of CLIC implicitly agreed to diligently perform the duties accompanying their status. Accordingly, they must be treated as occupying the position of trustees to *cestui que trust*.

■ In classifying the directors of an institution such as CLIC as trustees or agents of its investors and stockholders, the Court does not intend to in any way make them insurers of the corporation's fidelity by demanding constant supervision of the corporation's most minute and insignificant business affairs. The day to day affairs of any company are generally, by necessity, largely entrusted to managing officers. To mechanically hold directors constructively responsible for the acts of their officers would, indirectly, do harm to the concept of corporate responsibility by deterring men of good character from becoming directors of companies.

On the other hand, the directors of a corporation may not totally abandon their duties to the corporation or close their eyes to what is going on about them in the conduct of the business of the corporation and then use this as a defense for injury which results. See DePinto v. Provident Security Life Insurance Company, 374 F.2d 37 (9th Cir. 1967); Myzel v. Fields, 386 F.2d 718, 721 (8th Cir.1967), cert. den., 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d, 1143 (1968); Heit v. Bixby, 276 F.Supp. 217

(E.D.Mo.1967); National Auto & Casualty Ins. Co. v. Payne, 261 Cal.App.2d 403, 67 Cal.Rptr. 784 (1968); Platt Corp. v. Platt, 42 Misc.2d 640, 249 N.Y. S.2d 1 (1964), rev'd on other grounds, 17 N.Y.2d 234, 270 N.Y.S.2d 408, 217 N.E.2d 134 (1966); Neese v. Brown, 218 Tenn. 686, 405 S.W.2d 577 (1964). As noted in Platt Corp. v. Platt, *supra*, 249 N.Y.S.2d at 6:

"It is the obvious duty of directors to know what is transpiring in the business affairs of their corporation. They cannot assume the responsibilities of their fiduciary position, then simply close their eyes to what is going on around them and thereby avoid the consequences by the mere failure to act. While corporate directors are not liable for errors of judgment, nevertheless, the law holds them accountable for that which they reasonably should have known or discovered in the discharge of their duties. . . . Mere passivity and disavowal of knowledge alone do not and should not constitute a pass to freedom from responsibility."

In accordance with these basic precepts, the Court must apply a rule of reason giving due consideration to the competing interests. Just as the Court must not be overzealous in its desire to protect innocent third parties from mismanagement of corporate affairs, it must also not shield corporate directors from liability directly occasioned by an abdication of their responsibilities.

The Kansas rule of law regarding the fiduciary obligations of corporate directors is in accord with generally accepted principles and represents an accommodation of the competing interests. In Noll v. Boyle, 140 Kan. 252, 255, 36 P.2d 330, 331 (1934), the Kansas Supreme Court quoted with approval the following language from 14a C.J. 100:

"The directors of a corporation are chargeable with knowledge of . . . such corporate affairs as it is their duty to keep informed of, of the financial condition of the corporation; and of facts which the corporate books and records disclose. But they are not chargeable with knowledge of all of the affairs of the corporation, and it is held that they are not chargeable with knowledge of its business transactions."

The Court also quoted from Holmes v. Crane, 191 App.Div. 820, 182 N.Y.S. 270, as follows:

". . . a director is only liable to a corporation or its stockholders for his own acts or omissions and to render him liable for *ultra vires* acts of the corporation it must be shown and found that he voted therefor, participated therein, connived thereat, or negligently omitted to perform his duty . . . and aside from acts which are *ultra vires,* and for which their liability is as above stated, they are not liable for losses caused by a mere error of judgment, when they act without corrupt motive and in good faith."

Finally, Noll v. Boyle, *supra*, stands for the unsullied rule that "a director of a corporation is not charged with knowledge of what the officers in charge of the company are doing."

Following these rules, the Court must reject the defendant's contention that his acceptance of a directorship "in name only" in some manner immunes him from liability arising from mismanagement of the corporate affairs. Similarly, however, the Court must likewise reject the plaintiff's assertion that a lackadaisical attitude toward corporate responsibilities, in and of itself, automatically results in liability. Liability necessarily depends upon the particular facts obtaining in each individual case and cannot be determined by mere rote application of general principles. Briggs v. Spaulding, 141 U.S. at 138, 11 S.Ct. at 930.

In the final analysis, the defendant had the duty to exercise that care which an ordinarily prudent and diligent man would have exercised under similar circumstances. See Darling &

Company v. Petri, 138 Kan. 666, 671, 27 P.2d 255 (1933). In the context of this case, the plaintiff was accordingly required to prove that the defendant either: (1) knew of Elbel's mismanagement of CLIC's assets, yet idly sat by; or (2) in the exercise of reasonable care attending his responsibilities, should have been aware of suspicious circumstances demanding corrective action by a prudent and diligent director. After examining the evidence presented, the Court is constrained to find that the plaintiff has failed to meet its burden.

Admittedly, the defendant remained on CLIC's board of directors "in name only" for a period of approximately seven months after the transfer of his control to Elbel, during which time he did not actively participate in CLIC's financial affairs, independently review the corporate books and records, or take any action whatsoever to stop the drain of CLIC's assets. Rather, he devoted his time to the affairs of First Federal Savings and Loan Association and left the management of CLIC entrusted to vice president-director Carrington and secretary-director Oden, whom he had known and trusted for years, and president-director Elbel.

During this period of time, no board action was taken and no meetings were held; the defendant was continually reassured that the business of the corporation was growing, particularly its mortgage servicing business; and the defendant was never informed of any suspicious transactions. Despite the fact that neither Mr. Carrington nor Mr. Oden, who were both officers actively engaged in the management of CLIC, was suspicious of any of CLIC's financial transactions, the plaintiff nevertheless contends that the defendant was negligent in not taking corrective action, and that his negligence resulted in the losses ultimately suffered by CLIC's investors and creditors. The Court simply cannot agree with plaintiff's simplistic approach.

In compiling a composite picture of what actually transpired immediately following the transfer of control, which is reflected in the Court's Findings of Fact, the plaintiff did not merely rely on information gleaned from a cursory examination of the corporate books and records. Rather, it engaged in an extensive investigation into the intricacies of CLIC's most insignificant business transactions; it utilized the expertise of the Securities and Exchange Commission as well as a number of lawyers; it took advantage of information gathered and compiled in the process of a thorough criminal investigation; and, generally, it sifted through a virtual plethora of financial data. In this manner, and after expending the better part of a decade in the preparation of its case, the plaintiff was able to establish that Elbel had in fact schemed to loot CLIC's assets. The plaintiff now requests this Court to hold the defendant liable for not engaging in a similar process.

As previously noted, it is only when viewed with the perspective aided by hindsight of what actually occurred that the events which transpired during this seven month period look suspicious. At the time, all of the transactions now relied upon by the plaintiff appeared normal and proper, at least on their face. Granted, more emphasis was placed on individual or new financial endeavors subsequent to the transfer of control than before, but that was logically explained by a change in management. To now hold that these seemingly normal and proper transactions should have put a prudent director on notice of intended looting or precipitated a thorough investigation, based solely upon what actually transpired, is not permissible.

█ The defendant remained on CLIC's board of directors following the transfer of control to Elbel in order to insure a smooth transition of management. By doing so, he implicitly accepted the responsibilities demanded of that office, including: (1) the duty to attend and take an active part in any and all board meetings; (2) the duty to keep abreast of the general financial status of the corporation; (3) the duty

to investigate any suspicious circumstances coming to his attention in the performance of his duties as a director; and (4) the duty to refrain from realizing any personal pecuniary gain at the expense of the corporation. He was not, however, required to presume rascality, maintain a constant vigilance over the corporation's business transactions, or assume the responsibilities of the corporation's managing officers.

To reiterate, the affairs of any corporation are, by necessity, largely entrusted to managing officers whose duty it is to see to the corporation's day to day business affairs. In this instance, the defendant entrusted the general business affairs of CLIC to officers whose honesty, integrity, and general business acumen was confirmed by past service and reputation. Absent notice of suspicious circumstances which could be gleaned from a review of CLIC's general financial status, the defendant was entitled to rely on those officers, and he cannot be held liable for failing to assume their responsibilities or engage in an exhaustive independent examination of the corporation's business transactions.

The Court is aware of the trend toward strict enforcement of corporate responsibility brought about by a growing inclination on the part of officers and directors of large corporations to consider their personal interests and profits to the exclusion of the rights and interests of a large and uninformed body of stockholders, and it favors it. In addition, the Court is not callous toward the interests of CLIC's investors who suffered considerable financial losses as a consequence of mismanagement and ultimate bankruptcy. Nevertheless, it cannot be impervious to the rights and interests of this defendant. To saddle an innocent director with the responsibility of financial loss occasioned by the acts of others, simply to atone for the injury suffered by investors and not because of fault on his part, would be incredibly unjust and would serve to undermine, rather than strengthen, corporate responsibility.

In summary, the plaintiff has simply failed to prove that a conscientious and diligent director, in the defendant's position under similar circumstances, would have been aware of suspicious circumstances requiring investigation of CLIC's business transactions, or would have, or could have, taken any action to prevent the financial losses which ultimately ensued. In essence, the plaintiff would make the defendant an insurer of CLIC's fidelity by imputing to him knowledge of all of CLIC's business transactions and by making him responsible for the acts of other fiduciaries. To so hold would, however, go far beyond any rule of liability called to the Court's attention, and it would clearly run counter to Kansas law which is controlling. Noll v. Boyle, *supra,* 140 Kan. at 256, 36 P.2d 330. Accordingly, judgment must be rendered for the defendant.

The Court is indebted to and commends the excellent legal counsel on both sides of this case for the clarity and vigorousness of the presentation of facts and applicable law. The trustee and his attorneys, predecessor trustees and counsel, and the able counsel for the S.E.C. as friend of the Court, have performed an able public service in their long preparation for and trial of this case to resolve facts and issues of law which would otherwise have laid "smouldering or smelling" in the minds of the many persons who were touched by the harsh events of this case. Defendant's counsel, skillful masters of both the old school and contemporary styles of courtroom jurisprudence, have served the highest cause of a lawyer—competence and fidelity to a private client, as well as public service—by their long and dedicated service in the disposition of this matter. The Court is aware that the partisans on either side may not be satisfied in the result of this long litigation, but within our legal system, resolution and finality must come, subject, of course, to the processes of appellate review.

It is therefore ordered that judgment in the above-entitled action should be, and the same is hereby, rendered in defendant's favor, costs to be paid by the plaintiff. The defendant shall prepare, circulate, and submit to the Court an appropriate journal entry consistent with the findings herein embodied.